UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

DAVID ALLEN HICKS,

       Movant,

v.                                 CASE NO. 2:05-cr-00040
                                      CASE NO. 2:10-cv-01155

UNITED STATES OF AMERICA,

       Respondent.

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the court is the movant's Motion to Vacate, Set Aside, or Correct Sentence, pursuant to 28 U.S.C. § 2255 (ECF No. 303) ("2255 Motion"), filed on September 30, 2010.  The movant is currently serving a sentence of thirty years, to be followed by a lifetime term of supervised release, for his convictions on five child pornography-related offenses: two counts of production of child pornography, in violation of 18 U.S.C. § 2251(b); one count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2); and two counts of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  He timely filed this 2255 Motion in which he alleges various theories of ineffective assistance of counsel and prosecutorial misconduct.  In support of his 2255 Motion, Hicks filed a 110-page memorandum (ECF No. 304), with leave of court.  Two months later, the movant filed a 23-page supplemental/amended brief (ECF No. 320).

The United States filed its response (ECF No. 332), providing a copy of the Joint Appendix which was prepared for the purpose of the direct appeal (ECF Nos. 332-1 and -2; ECF No. 335).  Some portions of the trial transcript are filed under seal because those portions comprise the testimony of child witnesses.  The Joint Appendix contains the sealed portions in one volume (ECF No. 335).  For ease of reference in this Proposed Findings and Recommendation, the undersigned has cited to the pages of the Joint Appendix ("J.A.").  The movant then filed an 81-page response "brief" (ECF No. 346).  The undersigned has determined that an evidentiary hearing is not necessary.

## PROCEDURAL HISTORY

### Pretrial

The instant case was initiated in September 2004.  In that month, A.K., a minor and friend of the movant's daughter, informed her mother that the movant had taken photographs of her and his daughter in the nude.  A.K.'s mother informed the movant's former wife, Melissa Silvey, who notified West Virginia Child Protective Services ("CPS") on September 20, 2004.  United States v. Hicks, No. 2:05-cr-00040, ECF No. 41 at 1 [sealed].

On the morning of September 23, 2004, FBI Special Agent Jack Remaley received a copy of the initial CPS report.  Id. at 3.  Special Agent Remaley apparently promptly discussed the matter with Assistant United States Attorney ("AUSA") Stephanie Ojeda, and a

2

search warrant application and affidavit was presented to and signed by the undersigned at 4:13 p.m. that afternoon; the warrant was immediately executed.  In re Search of the residence of David Hicks, etc., No. 2:04-mj-00156 [sealed].  The warrant authorized the search of the movant's home for violations of 18 U.S.C. §§ 2252A(a)(5)(B) and 2251(a), federal statutes prohibiting possession of child pornography and child sexual exploitation.  J.A. 57.  The affidavit from Special Agent Remaley included the allegations reported by Ms. Silvey, as well as allegations reported to CPS staff involving the movant's misconduct towards children K.T. and C.P.  J.A. 53-56.  Due to a typographical error, the affidavit incorrectly stated that Special Agent Remaley searched for records related to the movant on September 24, 2004; the actual date was the 23rd, the day of the warrant application.  See ECF No. 41 at 5.

A grand jury returned a single-count indictment filed on February 16, 2005; his case was assigned to the Honorable Joseph R. Goodwin, Chief Judge.  The indictment, ECF No. 1, charged that on or about September 23, 2004, David Allen Hicks knowingly possessed a computer which contained images of child pornography that had been transported in interstate commerce, in violation of 18 U.S.C. § 2252A(a)(5)(B).  It also contained a forfeiture provision. Assistant Federal Defender Edward H. Weis was appointed to represent the movant.

On July 5, 2005, the movant filed a motion to suppress related

to the September 23, 2004, search of the movant's residence.  See ECF Nos. 35 and 36.  He argued, inter alia,[1] that (a) the affidavit did not provide sufficient information to support probable cause that the movant possessed child pornography and that an interstate commerce nexus existed and (b) the warrant was overbroad by permitting seizure of materials that were protected by the First Amendment and unrelated to the facts set forth in the affidavit. This motion was denied by Chief Judge Goodwin at a July 11, 2005, hearing.  See ECF No. 39.

On July 20, 2005, a superseding indictment, ECF No. 50, was filed against the movant.  This indictment differed from the original indictment in that it also charged the defendant with possession of a computer that contained images that had been produced using material that had been mailed, shipped and transported in interstate commerce by any means, including by computer.

An eight-count second superseding indictment, ECF No. 58, was then filed on August 30, 2005:

| COUNT | DATE OF OFFENSE | CHARGE | STATUTE |
|-------|-----------------|--------|---------|
| One | Summer 2003 | Production of Child Pornography | 18 U.S.C. § 2251(b) |

---

[1] The motion also contained an argument about the September 24, 2004, date listed in the affidavit, but that issue was resolved when the United States disclosed the typographical error.

| | | | |
|---|---|---|---|
| Two | Summer 2003 | Production of Child Pornography | 18 U.S.C. § 2251(b) |
| Three | September 4, 2004 | Receipt of Child Pornography | 18 U.S.C. § 2252A(a)(2)(A) |
| Four | September 4, 2004 | Receipt of Child Pornography | 18 U.S.C. § 2252A(a)(2)(A) |
| Five | September 5, 2004 | Receipt of Child Pornography | 18 U.S.C. § 2252A(a)(2)(A) |
| Six | September 11, 2004 | Receipt of Child Pornography | 18 U.S.C. § 2252A(a)(2)(A) |
| Seven | September 11, 2004 | Receipt of Child Pornography | 18 U.S.C. § 2252A(a)(2)(A) |
| Eight | September 23, 2004 | Possession of Child Pornography | 18 U.S.C. § 2252A(a)(5)(B) |

On February 8, 2006, a third superseding indictment, ECF No. 84, was returned against the movant:

| COUNT | DATE OF OFFENSE | CHARGE | STATUTE |
|---|---|---|---|
| One | Summer 2003 | Production of Child Pornography | 18 U.S.C. § 2251(b) |
| Two | Summer 2003 | Production of Child Pornography | 18 U.S.C. § 2251(b) |
| Three | September 11, 2004 | Receipt of Child Pornography | 18 U.S.C. § 2252(a)(2) |
| Four | September 23, 2004 | Possession of Child Pornography | 18 U.S.C. § 2252(a)(4)(B) |

5

| Five | September 23, 2004 | Possession of Child Pornography | 18 U.S.C. § 2252(a)(4)(B) |

On February 15, 2006, the United States filed a criminal complaint, charging the movant with crossing a state line in July 2004, with the intent to engage in a sexual act with a person under the age of 12, in violation of 18 U.S.C. § 2241(c).  United States v. Hicks, No. 2:06-mj-00017.  The movant was arrested and released on bond.   The charge was incorporated in the next, and final, version of the indictment as Count Four.

A final, eight-count, fourth superseding indictment, ECF No. 91, was filed against the movant on March 6, 2006.

| COUNT | DATE OF OFFENSE | CHARGE | STATUTE |
|---|---|---|---|
| One | Summer 2003 | Production of Child Pornography | 18 U.S.C. § 2251(b) |
| Two | Summer 2003 | Production of Child Pornography | 18 U.S.C. § 2251(b) |
| Three | July 2004 | Production of Child Pornography | 18 U.S.C. § 2251(b) |
| Four | July 2004 | Interstate Travel to Engage in a Sexual Act with a Minor Who Had Not Attained the Age of 12 Years | 18 U.S.C. § 2241(c) |

6

| Five | July 2004 | Interstate Transportation with Intent to Engage in Criminal Sexual Activity | 18 U.S.C. § 2423(a) |
| Six | September 11, 2004 | Receipt of Child Pornography | 18 U.S.C. § 2252A(a)(2)(A) |
| Seven | September 23, 2004 | Possession of Child Pornography | 18 U.S.C. § 2252A(a)(2)(A) |
| Eight | September 23, 2004 | Possession of Child Pornography | 18 U.S.C. § 2252A(a)(5)(B) |

Upon his arrest following his initial indictment, the movant was released on a $10,000 unsecured bond on February 17, 2005.  At his February 28, 2005, arraignment, the movant's bond was modified to include a specific condition of release that he have no contact with children under the age of 18 except in the presence of a responsible adult.  The movant was released on this previously executed bond following his arraignments on the July 2005 superseding indictment and the August 2005 second superseding indictment.  However, the movant had multiple problems on bond, resulting in his being remanded to custody on February 22, 2006. The movant's Presentence Investigation Report ("PSR") provides the details:

> 38.  On September 21, 2005, after receiving a complaint from the mother of an alleged juvenile victim, the defendant consented to a modification of his bond that prohibited him from being within 300 feet, or the line of sight, of 5243 Dalewood Drive, Lot 64, Cross Lanes, West Virginia.

7

39.  Although the defendant reported to the probation officer as directed, he failed to report a contact with the Kanawha County Sheriff's Department in October 2005, while attending a local cheerleading competition.

40.  Kanawha County Deputy Sheriff K.S. Moore reported that on October 8, 2005, the organizer of a cheerleading competition at Herbert Hoover High School, located in Clendinin, West Virginia, notified authorities that several parents had voiced concern about David Hicks' presence at the cheerleading competition.  Deputy Moore spoke with Mr. Hicks, who admitted he was under federal indictment for possession of child pornography and provided the name of his supervising probation officer. He admitted he was prohibited from being around minors without the presence of a supervising adult but stated that his mother and daughters were also attending the competition; shortly thereafter, the defendant's mother and two daughters joined the defendant and Deputy Moore. When asked why he was at the competition, Mr. Hicks reported that he was assisting a friend who had been hired to photograph the competition. The defendant was loading pictures taken of the competition participants on a computer, which could then be viewed by the parents for purchase.  Mr. Hicks, his mother, and his daughters voluntarily left the facility.

41.  On January 13, 2006, a representative for the United States Attorney's Office contacted Ms. Cueva to advise of the above and to report that Mr. Hicks had also been seen in a local mall in the company of a minor girl.

42.  Officer Cueva confronted Mr. Hicks about both issues on January 13, 2006.  Mr. Hicks confirmed he had been at the cheerleading competition in the company of his mother and daughters.  He also admitted he had been at the local mall with his daughter and a minor friend of the family. According to Shirley Hicks, the defendant's mother, she accompanied Mr. Hicks and the minor girls to the mall.

43.  As a result of these two incidents, the probation officer recommended the defendant's bond be revoked pending trial.  On February 22, 2006, the defendant and counsel appeared before Magistrate Judge Stanley to address the issue of detention and other matters. Based on evidence presented and the defendant's conduct while on bond, the Court concluded there was no condition or combination of conditions of release which would

> reasonably assure the safety of other persons and the
> community.  Magistrate Judge Stanley ordered that bond be
> revoked and vacated the Order Setting Conditions of
> Release.

PSR at 9-10 (ECF No. 296 [sealed]).

Several months after the movant's bond was revoked, the movant wrote Chief Judge Goodwin a letter requesting new counsel.  See ECF No. 149.  Chief Judge Goodwin granted this motion via order on June 9, 2006.  ECF No. 154.  On June 21, 2006, Troy N. Giatras and Nicholas S. Preservati, members of the Criminal Justice Act Panel, were appointed as co-counsel to represent the movant.  ECF No. 156.  Mr. Giatras is a 1990 graduate of the West Virginia University College of Law, and is an experienced criminal defense attorney who has argued a case before the Supreme Court of the United States.[2]  Mr. Preservati is a 1997 graduate of the Loyola University Chicago School of Law.

## Trial

Trial was continued several times after Messrs. Giatras and Preservati began representing the movant, and it was eventually rescheduled for January 17, 2007.  Count Three was dismissed by Chief Judge Goodwin at a hearing on January 10, 2007, ECF No. 191, on the ground that the photograph in question did not constitute child pornography.  See movant's motion to dismiss Count Three, at ECF No. 138.  At this January 10, 2007, hearing, Chief Judge Goodwin also severed Counts Four and Five for adjudication in a

---

[2] See United States v. Hayes, 555 U.S. 415 (2009).

separate trial.  See ECF 191.  However, these counts were eventually dismissed upon motion by the United States following the movant's conviction.  ECF No. 276.  Following a discussion at the January 10, 2007, hearing about the defendant's disclosure of an expert witness that the United States complained was tardy, Chief Judge Goodwin also stated that he would not allow any further continuances of the trial date.  "I recognize - and I wanted to say this to the defendants [sic]- this case has gone on too long, and delays that have been occasioned have not been the fault of the Government . . . I'm able to track the footprints right to the cell door of the defendant."  ECF No. 284 at 52.

The movant's trial commenced on January 17, 2007.  The United States presented forensic computer evidence from its FBI expert, Melinda Cash, J.A. 120-372, and testimony from various child witnesses, J.A. 608-737.

In his opening statement, defense counsel claimed that the movant had been framed by Ms. Silvey and her boyfriend, Mr. Jay Fuller, who had allegedly remotely hacked into the movant's computer and planted child pornography on it.  J.A. 112.  Defense counsel told the jury that Ms. Silvey had previously threatened to plant child pornography on his computer.  J.A. 112.  He further advised that Mr. Fuller had the expertise to "hack into websites," and that the man had done so in the past.  J.A. 116.  The United States objected to the Defendant's opening statement, J.A. 118-19,

and later filed a motion in limine proffering evidence and seeking exclusion of the Defendant's hacker evidence. ECF No. 211.

Following the close of the United States's case and prior to the commencement of the movant's case, the movant proffered various items of evidence that he claimed would prove that Ms. Silvey had a motive to frame him.  J.A. 409.  Chief Judge Goodwin followed-up on the details of an alleged "smoking gun" e-mail or instant message sent to Ms. Silvey from Mr. Fuller that was seen by H.R., a child from a previous marriage of Ms. Silvey. J.A. 411-17, 428.

> THE COURT: Tell me the basis for your belief, your good faith belief of, for this witness's testimony and what you believe it will be or would be.
> MR. PRESERVATI: Your Honor, several months ago the, the -- it was actually in June, approximately the middle of June, 2005, the juvenile told his mother that he had, in fact, came up in the middle of night and got on his mother's computer; that he saw an e-mail between her and Jay Fuller stating how they had, quote, how they pulled it off, and started describing the e-mail from Mr. Fuller to Melissa.  And they were making fun of David and talking about the custody issue.
> THE COURT: Now, say again.  How they had pulled it off and how --
> MR. PRESERVATI: How they had pulled it off and joking how he would not be able to see the girls.
> THE COURT: Did they describe what was meant by "pulled it off"?
> MR. PRESERVATI: I can read the notes for you, Your Honor: That the juvenile saw an e-mail between Jay and Melissa in which she was talking about porn that they put on David's computer and how they had pulled it off.  They were making fun of David and they·were bragging about how he would not be able to see the kids.
> That is from the interview with the mother and her conversation with the juvenile.
> THE COURT: All right. That's the source of your information?
> MR. PRESERVATI: That's the source of our information.

J.A. 427-8.

Chief Judge Goodwin reserved ruling on the merits of the admissibility of the third party hacker evidence until the defense notified the court that it had secured evidence tending to connect the alleged alternative perpetrators to the commission of the crime, specifically, H.R.'s testimony that he had seen an incriminating e-mail from Mr. Fuller. J.A. 417, 423, 431-32. The testimony of three children who were witnesses for the movant then followed. ECF No. 213. Defense counsel then apparently attempted again to secure H.R.'s testimony during a noon recess; following the recess, they advised the Court that "we have been unable to have [H.R.] served at this point and the witness is unavailable to our service." J.A. 426. Thereafter, defense counsel asked the Court to make a finding that H.R. was "unavailable" for the purposes of Fed. R. Evid. 804(a)(5). J.A. 434. Counsel argued that, despite two months' worth of attempts, H.R.'s parents had been uncooperative with service and that H.R. could not otherwise be found. J.A. 426-27, 433-34. Chief Judge Goodwin denied the request.

> THE COURT: Well, here's the problem. Here we are the third day of the trial, the Government having rested. Nobody came to me and said, "We've got trouble getting a witness, we need a continuance, we need the aid of the United States Marshal," or anything else.
>
> Instead we wait until we're in the middle of the defendant's case and you tell me that a person living in Kanawha County who has been spotted by

> people you've talked to is unavailable who is,
> without any dispute, based on what you've told me,
> within the jurisdiction, or maybe not.  Maybe he's
> gone on a trip, which you don't believe.
>
> I don't find the witness is unavailable.  Now,
> whatever, wherever that leaves you.

J.A. 435.  The defense raised inferences that movant's computer had been hacked, but did not present any direct evidence of such an intrusion.

On January 23, 2007, the jury convicted the movant on all counts before it, Counts One, Two, Six, Seven, and Eight of the fourth superseding indictment.  He was sentenced by Chief Judge Goodwin on November 2, 2007, ECF No. 268.  The movant received a term of thirty years imprisonment on Count One, thirty years on Count Two, twenty years on Count Six, ten years on Count Seven, and ten years on Count Eight.  (Judgment in a Criminal Case, ECF No. 269.)  Counts Two, Six, Seven and Eight were ordered to run concurrently with Count One, for a total of thirty years of imprisonment.  Id.  Chief Judge Goodwin also ordered a lifetime term of supervised release and a $500 special assessment.  Id.  At sentencing, the movant's offense level was increased by two levels for obstruction of justice, pursuant to U.S.S.G. § 3C1.1.  Chief Judge Goodwin held that the increase was necessary due to the movant's perjurious testimony at trial.

> I listened to the witness testify. I find that
> he testified falsely as to material matters.  He
> testified falsely regarding the taking of the
> photos in Counts One and Two.

> I find that he testified falsely about how the
> pornography contained in the CDs which were over on
> the dresser or side area came to be there without
> his knowledge; that it was a rather preposterous
> and false, willfully false testimony on a material
> fact.
> He also falsely denied viewing the pornography
> and seemed to deny any knowledge of having it, and
> all of which was not true.
> So, I find that he perjured himself on the
> witness stand and that's good enough for an
> obstruction of justice enhancement.
> You know, I certainly think that there is some
> evidence here that I observed at the trial and Mr.
> Hicks during the testimony of witnesses that I
> could consider. I just don't need to get to it.

ECF No. 250 at 41. Given this finding, Chief Judge Goodwin did not

reach the PSR's additional recommendation that letters written from

the movant to his daughters also constituted obstruction. Id. at

40-41. Chief Judge Goodwin also applied an enhancement under §

4B1.5 for a pattern of activity involving prohibited sexual

conduct. He found that the movant's convictions under Counts 1 and

2 made him eligible for the enhancement, and that "[t]he

convictions for the production of child pornography and the conduct

testified to by [K.C.] constitute, and the Court finds they

constitute, a pattern of prohibited sexual conduct under the

guidelines." ECF No. 287 at 5.

## Appeal

The movant timely appealed to the Fourth Circuit. ECF No.

271. Initially the movant was represented on appeal by Troy

Giatras. However, on January 25, 2008, the Fourth Circuit granted

a motion from the movant to relieve counsel and appointed John Carr

to represent the movant on appeal.  However, Mr. Carr moved to withdraw on January 31, 2008, due to a conflict of interest.  The Fourth Circuit then appointed David Schles on February 25, 2008. Mr. Schles represented the movant for the remainder of his appeal.

On appeal, the movant argued that (1) the evidence was insufficient to support his conviction for production of child pornography; (2) the district court erred by excluding evidence that someone other than him placed pornography on his computer; (3) the district court erred in permitting the Government to introduce evidence of his other bad acts; (4) the district court erred in denying his motion to suppress evidence obtained from the search of his home because the search warrant was issued without probable cause; (5) the district court erred by limiting cross-examination of child witnesses about past instances of molestation by perpetrators other than the movant; (6) his counsel was constitutionally ineffective; and (7) the cumulative effect of errors at trial deprived him of a fair trial.  United States v. Hicks, 307 Fed. Appx. 758, 760 (4th Cir.), cert. denied, 130 S. Ct. 123 (2009).  In an unpublished opinion dated January 20,2009, the Fourth Circuit rejected these claims and affirmed the movant's convictions.  Id. at 764.  With regard to the movant's arguments regarding the cross-examination of child witnesses, the Fourth Circuit wrote that

> [t]he Sixth Amendment's Confrontation Clause guarantees
> the accused the right to cross-examine witnesses.

15

However, the Confrontation Clause does not guarantee counsel the right to unfettered, unlimited cross-examination, nor does it prevent a trial judge from imposing reasonable limits on cross-examination based upon concerns about harassment, prejudice, confusion of the issues, witness safety, repetition, or relevance. Thus, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

Here, it is clear from the record that the district court judge did no more than impose a reasonable limit on the cross-examination based upon legitimate concerns of potential harassment of witnesses, confusion of issues, and relevance. Accordingly, we find that such reasonable limitation did not amount to an abuse of discretion

Id. at 763 (internal citations and quotations omitted).

The movant timely filed the instant 2255 motion on September 30, 2010.

## **FACTS OF THE CASE**

<u>Production of Child Pornography - Counts One and Two</u>

Counts One and Two of the fourth superseding indictment charged the movant with knowingly permitting A.K., a friend of the movant's older daughter, Ka.H., to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, in violation of 18 U.S.C. § 2251(b).  ECF No. 91, at 1-2. The visual depictions consisted of two photographs of A.K. that were taken within the span of six minutes in the movant's bathtub on June 12, 2003, at 9:36 p.m. and 9:42 p.m., respectively.  J.A. 304-5.  The photograph for Count One depicts a close-up view of A.K.'s genitalia and buttocks; her face is not shown in this

16

photograph.  Gov't Ex. 31; J.A. 295.  The photograph for Count Two shows A.K.'s face; she is sitting nude in the bath water with her knees bent and spread apart, and her index fingers are pointing at her nipples.  Gov't Ex. 33; J.A. 297, 544-45.

A.K. testified at trial about the photographs and the circumstances of their creation:

> Q. [A.K.], when you were at Dave's house and you were taking baths, was there ever a time when someone took photos of you?
> A. Yes.
> Q. Who took photos of you when you were in the bathtub?
> A. [Kr.H.] and Dave.
> Q. [Kr.H.] and Dave?
> A. Yes.
> Q. Did it happen on more than one occasion?
> A. Yes.
> Q. I'm sorry?
> A. Yes.
> ***
> Q. [A.K.], I'm going to show you a couple pictures. Okay?
> A. Okay.
> Q. And these are from, for the record, Exhibit Number 32.[3] And the first one I'll reference by the digital photo number of 1908 [Count One]. And I'm going to ask you to take a look at this picture here. Do you recognize that picture?
> A. No.
> Q. - Do you know who's in that picture?
> A. No.
> Q. You need to speak up.
> A. No.
> Q. You don't know who's in the picture?
> A. No.
> Q. Okay. I'll retrieve that exhibit. I'm going to show you what's been retrieved from Government's Exhibit Number 32 and it's digital photo number

_____

[3]  Exhibit 32 includes many photographs, including Gov't Exhibit 31 (Count One) and Gov't Exhibit 33 (Count Two).

1916 [Count Two] I'm going to show you that. Do you
know who's in that picture?
A. Yes.
Q. Who is it?
A. It's me.
Q. Okay. And where was that picture taken?
A. In Dave's house.
THE COURT: In Dave's house? Is that what you said?
THE WITNESS: Yes.
BY MS. FORBES:
Q. The second picture I showed you, digital camera
picture number 1916, who took that picture?
A. I don't remember.
Q. Okay. You said that there were two people who
had taken pictures of you in the bath?
A. Yes.
Q. And who were they?
A. [Kr.H.] and Dave.
Q. Okay. Were there ever any other people who had
taken pictures of you in the bathtub?
A. I don't think so.
***
Q. Is that [digital camera picture number 1916] the
photo that you said either Dave or [Kr.H.] had
taken?
A. Yeah.
Q. [A.K.], do you see David Hicks in the courtroom
here today?
A. Yes.
Q. Could you point him out and tell me something
that he's wearing?
A. Blue shirt.
Q. I'm sorry?
A. Blue, blue shirt.
MS. FORBES: Your Honor, I would ask that the record
reflect the identification of the defendant.
THE COURT: The record may so reflect.

J.A. 749-52.  On cross-examination, A.K. was further asked about

the photographs.

Q. When was the first time you told someone about
the pictures that were taken of you in the tub?
A. I don't think I did.
Q. Pardon me?
A. I don't think I told anybody.
Q.  You've never told anyone ever that those

18

pictures were taken of you?
A. I told the people that asked like Tessa and
them.
Q. And didn't you tell the Government that David
never took pictures of you in the bathtub?
A. I don't remember.
Q. I'm sorry. You don't remember telling the-
Government that?
A. No.
***
Q. The times, at least on one occasion when [Kr.H.]
took a picture of you in the bathtub, [Ka.H.],
David's older daughter, yelled for David to come in
the bathroom?
A. No.
Q. That never happened? Did David ever punish you
and [Kr.H.] for taking pictures in the bathtub?
A. [Ka.H.] and who?
Q. Did David ever punish you and [Kr.H.], his
youngest daughter, for taking pictures in the
bathtub?
A. I never took any pictures.
Q. Did David ever punish [Kr.H.] for taking
pictures - -
A. No.
Q. -- of you in the bathtub?
A. No.
Q. Did David ever punish you for allowing [Kr.H.]
to take pictures in the bathtub?
A. No.

J.A. 753-55.

During the movant's case, his daughter Kr.H. also testified
about the photographs.

Q. Okay. What were the kind of things that you
would do with your sister's friends when they were
at the house?
A. We would play around and we would -- that's
pretty much all.
Q. Would you swim?
A. In the summer and spring.
Q. Okay. Dance, rollerskate, anything like that?
A. Yeah.
Q. Did either you or your friends -- were there
ever any pictures taken when you guys were doing

19

this?
A. Well, one time [H.M.] . . . was there and me and
my sister and [H.M.] put on our dance recital
outfits and we took pictures.
Q. Do you remember who took those pictures?
A. Usually my dad.
Q. Did your sister ever take any of the pictures?
A. Not that I can remember.
Q. Did any of the other girls take any of the
pictures?
A. Not that I can remember.
Q. Did you take any of the pictures?
A. Not that I can remember.
Q. Do you ever recall a time that pictures were
taken in the bathroom?
A. Uh-huh.
Q. Can you tell me a little bit about that?
A. My sister and [A.K.] were in the tub and I took
pictures of them.
Q. Do you remember how many pictures you took?
A. No. I took a few, though.
Q. What happened after you took the pictures?
A. I got in trouble.
Q. From whom?
A. My dad.
Q. Can you tell me about that?
A. I had to go to my room.
Q. Did you get in trouble for taking pictures in
the bathroom?
A. Yes.
Q. What did he tell you?
A. I can't remember.
Q. Do you remember if anybody else got in trouble
that night?
A. No.
***
Q. I just want to ask you to clarify something you
said earlier. You said that you had taken
photographs of [A.K.] and your sister in the
bathtub. And earlier you mentioned that you hadn't
taken pictures, or you couldn't remember taking any
pictures.  I just wanted to clarify if you do
remember using a digital camera in the house to
take pictures.
A. I was referring to when the, my sister's friends
came over. But other times I've taken pictures in
the house was I've taken pictures of my cat and my
turtle.

20

Q. Okay.

J.A. 780-81; 783-84.  Then, on cross-examination by the government,

Kr.H. further testified about the photos.

> Q. [Kr.H.], when you used -- you talked about using
> the camera. Did you have to ask permission to use
> the camera?
> A. Not all the time.
> Q. But sometimes?
> A. Sometimes.
> Q. And when the pictures -- you said it was a
> digital camera. When the pictures were on the
> camera, they went from the camera to your dad's
> computer; right?
> A. Uh-huh. And they were -- yeah.
> Q. I'm sorry?
> A. Nevermind.
> Q. Is that how it was, though; they would be on the
> camera and the computer?
> A. Yes.
> Q. And your dad was always the one that did that?
> A. Uh-huh. And sometimes me and my sister would
> look at them.
> Q. And you would see pictures of you and your
> friends swimming and things like that?
> A. Yeah.
> Q. Okay. Now, [Kr.H.], this may seem like a funny
> question, but you took baths in the house; is that
> right?
> A. Huh?
> Q. You liked to take baths at your dad's house?
> A. Huh?
> Q. Did you like to use the bathtub at your dad's
> house?
> A. We didn't take a bath very often.
> Q. Okay. When you did take a bath, your dad was
> always in the house; is that right?
> A. Yeah, usually on his computer.
> Q. He wasn't very far away?
> A. Not really.
> Q. If you needed help, he would be nearby to help
> you if you needed it; right?
> A. I guess.
> Q. And when you were taking your baths, did your
> dad come into the bathroom a lot?

A. No.

Q. Never?
A. Well, he would sometimes to use the bathroom,
but then he would leave.
Q. Okay. While you guys were in the bathtub?
A. Yeah.
Q. Okay. [Kr.H.], I'm going to show you a picture.
Okay?
A. Okay.
Q. It's going to come up on your screen there.
A. Oh, okay.
***
Q. Okay. I found it, [Kr.H.]. I'm going to show you
what's been marked as Government's Exhibit Number
33 [Count Two], and I'll just put it up here for a
minute. Okay? Can you take a look at that?
A. Okay.
Q. Do you see that there?
A. Yeah.
Q. Who's in that picture?
A. I don't know.
Q. You don't know who it is?
A. Huh-uh.
Q. Do you know who took that picture?
A. Huh-uh.
Q. I'm going to show you another picture. Okay?
A. Okay.
***
Q This is from Government's Exhibit 32 and I'll
identify it as digital camera number 2530.[4]
THE COURT: All right.
BY MS. FORBES:
Q. Take a quick look at that, [Kr.H.]. And do you
see that picture there?
A. Uh-huh.
Q. Do you know who's in that picture?
A. No.
Q. Do you know who took that picture?
A. No.

J.A. 785-89.  Next, Ka.H. testified as a witness for the movant,

and discussed the photographs.

      Q. Okay. In regard to each of the specific girls
      that you've mentioned would come over, can you tell

---

[4] This is a photograph of child witness C.A.; see _infra_.

me how often each one of those would spend the
night?
A. [A.K.] was like one of my best friends, so she
spent the night a lot.
Q. If you had to guess how many times a week, could
you tell us?
A. Four or five.
Q. And how about [K.C.]?
A. Four or five.
***
Q. [Ka.H.], do you recall pictures ever being taken
in the bathroom?
A. Yes.
Q. Can you tell me a little bit about that?
A. Me and [A.K.] were in the bathtub, and my sister
came in and started taking pictures.
Q. And then what happened?
A. My dad took the camera and uploaded the pictures
and deleted them.
Q. Did anybody get in trouble?
A. My sister did.
Q. Can you tell me a little bit about that?
A. Huh-uh.
Q. Were you in the tub at the time these pictures
were taken?
A. Yes.
Q. Can you describe for me what you did when your
sister came in?
A. I hid behind the shower curtain.
Q Did you do anything else?.
A. I yelled for my dad.
Q. And what did you -- why did you yell?
A. Because I didn't like that [Kr.H.] was taking
pictures.
Q. Then what happened after you yelled?
A. He came in there and took the camera.
Q. Okay.
***
Q. I'm going to show you what's marked as
Government Exhibit Number 31 [Count One], and I'll
show you this very quickly.  Have you seen that
photograph?
A. Yes.
Q. Can you describe that photograph?
A. That was [A.K.].
Q. And do you recall if that was one of the
photographs that your sister took?
A. Yes.

23

```
MR. PRESERVATI: Your Honor, may I publish it?
THE COURT: Yes.
BY MR. PRESERVATI:
Q. Is that you -- you were in there when your
sister took this photograph?
A. Yes:
MR. PRESERVATI: May I approach, Your Honor?
THE COURT: You may.
BY MR. PRESERVATI:
Q. I'll show you what's marked as Government's
Exhibit Number 33 [Count Two].  I'll again ask you
if you recognize that photograph.
A: Yes.
THE COURT: Do you need some water? Would you like a
glass of water?
THE WITNESS: Huh-uh. I'm fine.
THE COURT: All right.
MR. PRESERVATI: Your Honor, may I publish this for
a second?
THE COURT: Yes.
Q. Were you present when that photograph was taken?
A. Yes.
Q. Who took that photograph?
A. My sister.
Q. Did you see her take that photograph?
A. Yes.
```

J.A. 793; 798-800.

Finally, during his own testimony, the movant also discussed

the photographs.

```
Q. You've seen some pictures of, of [A.K.] at, in
the bathtub --
A. Uh-huh.
Q. -- that were here. Let me you ask, did you take
either of those two photographs?
A. No, I didn't.
Q. Do you know who took those photographs?
A. Yes.
Q. And who is that?
A. That was [Kr.H.], my youngest daughter.
Q. Did you at some point after they were taken find
out that they had been taken, or learn that they
were taken?
A. Well, I learned that they were being taken when
[Ka.H.] yelled. I was in playing on the computer
```

24

and I heard [Ka.H.] screaming, "Dad, [Kr.H.]'s in here taking pictures of us."  So, I yelled back, told her to stop.

I was in the middle of -- I play a game called EverQuest. I was in the middle of a raid. We were killing a monster. And I yelled at her first to stop, and then I thought I heard her walk back into the living room. So, I figured she'd stopped. I don't know for a fact whether she stopped at that point or not.

But then I heard her yell maybe a minute later that she was doing it again, and I got up and ran in there.  And when I came in, she was getting ready to take another picture. And I grabbed the camera out of her hand and told her to go to her room.
***
Q. You've, you've had the opportunity to listen to everything that's happened in this courtroom in your case; is that correct?
A. Yes.
Q. And after hearing -- and after hearing that, sir, there are some, there's allegations that are very clear that you allowed there to be an environment in that home that allowed for the taking of pictures of particularly young girl [A.K.] of a sexually explicit nature. Do you understand that?
A. Yes.
Q. Was it ever your intention or desire to create that type of environment?
A. Definitely not. That's why I punished them for it any time they did something like that, which happened kind of often with that particular child.
Q. Was it ever your desire or intent to create an atmosphere that would make it uncomfortable for any of the kids to be at the house?
A. Definitely not. I wanted them all to have fun and have a good time and be happy, have a good life.

J.A. 507-08; 532-33.  The United States further brought up the

photographs during its cross-examination of the movant.

Q. Mr. Hicks, I'm going to show you some pictures. I'm going to show you Government's Exhibit Number

25

33 [Count Two].
A. Okay.
Q. Can you see that?
A. Yes.
Q. Who is that?
A. That's [A.K.].
Q. Would you agree with me that that's sexually explicit conduct?
A. It's disgusting conduct.
Q. You agree with me that that occurred in your house?
A. That did occur in my house.
Q. And it occurred in your house while you were there?
A. Yes.
Q. I'm going to show you what's been entered into evidence as Exhibit Number 31 [Count One]. Do you see that picture?
A. Yeah.
Q. Who is that?
A. That's [A.K.] too.
Q. That occurred in your house?
A. Yes.
Q. Occurred in your house while you were nearby?
A. I was not nearby.
Q. You were in your room? Is that what you said?
A. I was in my room.
Q. That's not nearby?
A. That's 70 feet away, but I was in the same house.
Q. Okay.
A. It's not as if I was in the room when it happened. I had no control of the situation or knowledge of it.
Q. Would you agree with me, Mr. Hicks, that those pictures have the same file name structure, AP.A, as the thousands and thousands of other images of child pornography that were contained on your computer?
A. That what?
Q. The -- those images have the same file name, AP.A, that structure, as the thousands and thousands of other images of child pornography that were found on your computer?
A You mean the file that those images were found in?
Q. The name AP.A.
A. You want to know if --

26

Q. I'm asking you if you are aware that they had the same name as the thousands and thousands of child porn images from the internet that were found on your computer.
A. Yes.
Q. You don't dispute that?
A. How could I?

J.A. 544-46.

Possession and Receipt of Child Pornography - Counts Six, Seven, and Eight

Background

Despite long-term employment at Pizza Hut, according to his own testimony and resumé the movant is an "A+ certified Microsoft systems engineer" with twenty-plus years of experience with computers, and is "very proficient in most operating systems." J.A. 535 & 536; Gov't Ex. 6.  There were two computers in his bedroom.  J.A. 138.  One was his and the other belonged to Ka.H., his older daughter.  J.A. 644-45.  The movant built his own computer.  J.A. 537.

According to the government's expert computer witness, Melinda Cash, the movant's computer had four separate hard drives, which is unusual.  J.A. 142, 159.  Combined, the hard drives contained approximately 137 gigabytes of storage space.  J.A. 280-81.  The computer had access to the Internet and was equipped with a "Wiper Wizard" program which could be used to erase evidence of internet browsing history and other activities.  J.A. 139, 154.

All four of the hard drives on the movant's computer contained

thousands of pornographic images of children ranging in ages from five to twelve. J.A. 170, 372, 541-42. The movant's computer desktop contained shortcuts[5] that allowed much of the child pornography to be accessed with one or two clicks of his mouse. J.A. 172-73, 214. The majority of the child pornography files stored on the first hard drive were contained in a sub-folder within a file folder containing the movant's "Everquest" computer game files. J.A. 171. Everquest was an Internet game that the movant liked to play. J.A. 508. At the time of the September 2004 search of the  movant's home, the fourth hard drive was physically disconnected from the computer. J.A. 142. The last time the files in that fourth drive had been accessed was in October 2002. J.A. 143. Child pornography on the other drives had been accessed as recently as September 22, 2004, the day before the search of the movant's residence. J.A. 237. Each of the four hard drives was filled nearly to capacity. J.A. 280-81.

Much of the child pornography found on the movant's computer was contained in archived files. J.A. 192. The computer had an archiving or file compression program called "Power Archiver." J.A. 153. This program permitted the movant to place multiple files within another file and thereby archive the files and

_____

[5]  A shortcut is an icon that leads to a program or data file.  A shortcut can be placed on the computer's desktop or stored in other folders; clicking a shortcut is the same as double clicking the original file.

conserve space on his hard drives.  Id.  The movant's computer contained approximately 900 archived file folders on all four of his hard drives, most of which were located in the movant's Everquest user data folder.  J.A. 183, 360.  Combined, these folders were created over the course of approximately 150 different days.  J.A. 185-188, 361.  In order to archive a file, the computer user had to take a series of affirmative actions on the computer; these types of files could not be created automatically by the computer system.  J.A. 174-75.  The movant's archived files had atypical file extensions.  J.A. 176. A file extension helps the computer decide what program to use to open the file.  Id.  One of the atypical file extensions the movant's archived files had was ".A".  Id.  Government Exhibit 32 consisted of 168 photographs of the movants' daughters and their friends.  J.A. 295.[6]  These photographs were stored in a file named "AP.A" that was located on the first hard drive in the TEMP directory.  Id.  All of the photographs were taken with a Kodak DC-280 digital zoom camera, J.A. 298.

In addition to the Wiper Wizard and Power Archiver programs, the movant's computer also had a peer-to-peer file sharing program called "Kazaa-Lite." J.A. 153, 216.  Kazaa-Lite permits Kazaa-Lite users to share their files.  J.A. 216-17.  A Kazaa-Lite user places

---

[6] Within this exhibit were the photographs for Counts One and Two.

in a shared folder on his computer any file that he is willing to share with other users.  Id.  A user may search for a particular file on the Kazaa-Lite network by typing in the name of the item sought; the program then generates a list of matching items.  Id. The user may then download a selected item to his computer.  J.A. 218.  In order for a file from Kazaa-Lite to be downloaded to a computer, the user of that computer must affirmatively request it. Id.  A Kazaa-Lite user cannot target another Kazaa-Lite user's computer and send a file to it.  Id.

One file downloaded by the movant's Kazaa-Lite program and stored in his third hard drive was a video with the file name "pthcporn(11).avi".  J.A. 206, 224.  A child pornography file with "pthc" in the file name typically refers to "pre-teen hardcore." J.A. 213.  This particular file was moved out of the movant's Kazaa-Lite shared folder on September 11, 2004, and later stored in one of the movant's archived folders on September 21, 2004.  J.A. 211, 225-26.  Other child pornography movies were downloaded and saved to the movant's computer via Kazaa-Lite.  J.A. 227.

Although the movant's computer was not equipped with any specialized security software, it contained no viruses nor any evidence that it had been hacked into by a remote computer.  J.A. 365-66, 469, 478.  Moreover, the operating system was capable of detecting whether any other computer had connected to the movant's computers.  J.A. 366.  Certain folders on the first and second hard

drives permitted limited shared access; however, the third hard drive did not permit sharing. J.A. 364. The fourth drive was not physically attached to the computer and, thus, its files could not be accessed by any computer. J.A. 364. For a remote computer user to access the movant's computer, he would need to know (1) the movant's computer "IP" address, (2) how to connect to that address and (3) have a specialized utility, a "lap drive." J.A. 365-66. There was no evidence of a lap drive on the movant's computer. Id.

Count Six

Count Six of the fourth superseding indictment charged the movant with receipt of child pornography on September 11, 2004, in violation of 18 U.S.C. § 2252(a)(2). Specifically, the movant was alleged to be in receipt of the computer digital child pornography video image file titled "Pthc porn(11).avi" and "pthcp0~1.avi." At trial, it was introduced as Government Exhibit 12. J.A. 206-207. The video was located on the third hard drive of movant's computer. Id. This video showed the rape of a young girl, ECF No. 246 at 36, who was eight years old at the time that the FBI found her when it searched the house of James Perry, the individual who produced the video.[7] ECF 243, Ex. 3 at 30-31. During the video, the victim wore pink underwear, and apparently cried and said, "Mommy, mommy,

---

[7] Perry is currently serving a 180 year federal prison sentence following his guilty plea to six counts of sexual exploitation of children. United States v. Perry, No. 3:04-cr-34 (W.D. Wis. July 22, 2004); see Doug Erickson, The Troubled Past of James Perry, Wisconsin State Journal, July 25, 2004, at A1.

I want my mommy." Id. at 31-32; Gov't Ex. 38.  In her closing argument, AUSA Forbes described the video as "horrific."  ECF No. 246 at 36.  Chief Judge Goodwin severed Counts Four and Five (Interstate Travel to Engage in a Sexual Act with a Minor who had not attained the age of 12 years and Interstate Transportation with Intent to Engage in Criminal Sexual Activity) because the display of the video would be prejudicial to the movant with regards to those counts.  He stated that "I've never granted a motion for severance in my life, but I'm going to grant this one.  I can't imagine more inflammatory evidence in a case than the rape of a prepubescent child."  ECF No. 284 at 40.  The video was published to the jury at trial.  J.A. 308-09.  FBI Agent Stephen Paulson, who participated in the search of the Perry residence, testified at trial and sponsored Government Exhibit 38, a photograph of the pink underwear.  ECF 243, Ex. 3 at 31-32.  He testified that while the FBI could not determine whether the video was filmed at the Perry residence, none of the events in the Perry case, to the best of his knowledge, occurred in West Virginia.  Id.

Counts Seven and Eight

Counts Seven and Eight of the fourth superseding indictment charged that, on September 23, 2004, near Cross Lanes, West Virginia, the movant knowingly possessed one or more computer hard drives (Count Seven) and computer discs (Count Eight), that contained child pornography, in violation of 18 U.S.C. §

2252(a)(4)(B).

Other Acts Evidence

    Count Three

    Count Three, which, as noted above, was eventually dismissed, charged that in July 2004, the movant, while having custody and control over K.C., a friend of Ka.H., knowingly permitted K.C. to engage in sexually explicit conduct for the purpose of producing child pornography.  Specifically, K.C. was dressed in a dance leotard that was too small for her, and the outline of her genitalia was clearly visible underneath the tight clothing.  K.C. testified about a series of photographs found in Government Exhibit 32, and testified to the jury under other acts evidence.

    Q. You were talking about David taking pictures of
    you.  And I think you said that he took pictures of
    you -- did he take pictures of you when you were
    dancing?
    A. Yes.
    Q. Did that happen more than once?
    A. Yes.
    Q. How many times do you think it happened?
    A. Every time I would dance mostly.
    Q. Okay. Tell us a little bit about how that
    happened.  Whose idea was it for you to do this?
    A. It was all of our idea.
    Q. Okay.
    A. [Ka.H.] danced sometimes with me.
    Q. Okay. Were you taking dance in school?
    A. No. We had dancing classes.
    Q. When you were -- the times you were dancing,
    David was taking pictures?
    A. Yes.
    Q. And the outfit that you were wearing, the dance
    outfit, whose was that?
    A. It was [Ka.H.]'s little sister's.
    Q. Is her name [Kr.H.]?
    A. Yes.

                              33

Q. And how much younger is she than you?
A. I'm not for sure, but I'm thinking it's three years.
Q. Okay. Is she smaller than you?
A. Yes.
Q. And whose idea was it for you to wear that?
A. David's.
Q. Did you want to wear it?
A. Not really.
Q. Why not?
A. Because it was too small.
Q. What -- did you say anything to him when he asked you to wear it?
A. No.
***
Q. I'm going to show you five pictures that have been previously entered into evidence contained within Exhibit 32, I believe it is, and ask if these are some of the pictures. And I'll go through them one by one and I'll - -
***
Q. [K.C.], when we left off, I was going to show you some pictures. And we were talking about dancing and about pictures being taken when you were dancing. Remember that?
A. Yes.
Q. Okay.  For the record, I'm going to show you a series of pictures that have been previously entered into evidence in Government's Exhibit 32.
MS. FORBES: And, for the record, I'll identify them by the digital camera photo number, Your Honor.
THE COURT: Very well.
MS. FORBES: The first one is 3670.
BY MS. FORBES:
Q. Do you see that, [K.C.]?
A. Yes.
Q. Do you recognize it?
A. Yes
Q. All right. That's you; is that right?
A. Yes.
Q. Okay. And is that one of the pictures that was taken when you were dancing?
A. Yes
Q. Okay. The next one is digital camera photo number 3675. Do you see that [K.C.]? Is that you?
A. Yes.
Q. The next one is digital camera photo number 3676. Do you see that, [K.C.]?

34

```
A. Yes.
Q. Same thing?
A. Yes.
Q. This one here, this is digital camera photo
3681. Is that you?
A. Yes.
Q. Digital camera photo 3694. Is that you, [K.C.]?
A. Yes
Q. And, finally, digital camera photo 3695. Is that
you?
A. Yes.
Q. Where were these pictures taken?
A. At David's house in the living room.
Q. I'm sorry?
A. In the living room at David's house.
Q. Who else was with you at the time these pictures
were taken?
A. [Ka.H.] and [Kr.H.].
Q. The two Hicks daughters?
A. Yes.
Q. Do you know who took these pictures?
A. David.
```

J.A. 648-50; 658-660.

Counts Four and Five

Counts Four and Five also involved K.C.  In Count Four, the movant was charged with traveling from Cross Lanes, West Virginia, to Myrtle Beach, South Carolina, over the weekend of July 4, 2004, with the intent to engage in a sexual act with K.C., who had not yet attained the age of 12 years, in violation of 18 U.S.C. § 2241(c).  Count Five charged the movant with knowingly transporting K.C., a child under the age of 16, from Cross Lanes, West Virginia, to Myrtle Beach, South Carolina, with the intent to engage in criminal sexual activity with her, in violation of 18 U.S.C. § 2423(a).  As noted, these counts were severed for separate trial, and later dismissed after the movant was convicted.  However, K.C.

35

testified as to the Myrtle Beach trip and other acts of molestation under other acts evidence.

K.C. testified that the movant had a habit of bringing towels while she and the movant's daughters were taking a bath, and then not leaving the bathroom for upwards of five minutes.  J.A. 662. She stated that the movant once adjusted her bathing suit strap by tying it too loosely, where it would then fall off.  J.A. 665-66. She testified that the movant molested her twice prior to the Myrtle Beach trip, sticking his hand underneath her underwear while she was sleeping and rubbing the outside of her genitals in one instance, J.A. 668-69, and laying on top of her moving up and down while she was sleeping in a different instance; she testified that it felt like "a hard rock going in my butt."  J.A. 669-70.

During the Myrtle Beach trip itself, K.C. testified that after she told the movant's older daughter that sand was in her bathing suit, the movant took her into a portable shower, removed the bottom of her swim suit, and used both of his hands to look inside and outside of her genitals under the guise of trying to get the sand out; K.C. estimated that this went on for fifteen or twenty minutes.  J.A. 675-77.

On cross-examination, K.C. testified that the first person she informed about the molestation was her mother, several years after the fact.  J.A. 689; 694; 699.  She states that the reasons for the delay in reporting were "[b]ecause -- there was actually two

reasons. Because I was scared of what would happen, and my mom had a really bad temper. And if I would have told someone, it would have came back and she would have known." J.A. 700.  K.C. also identified a photograph of her and the movant's daughters that was taken at the movant's home a month after the Myrtle Beach trip. J.A. 705-6.

### Additional Child Other Acts Witnesses

#### K.T.

K.T. was a friend of the movant's older daughter; Chief Judge Goodwin called a five minute recess prior to her testimony due to the fact that she had just vomited.  J.A. 723.  She testified that on one instance the movant told her that he could see through her bathing suit. J.A. 731.  The movant repeatedly walked into the room while she was changing clothing despite her request that he not do so.  J.A. 731-32, 735.  On another occasion, the movant went into the bathroom while she was in the bathtub washing fingerpaint off her body and bathing suit.  J.A. 730-31.  The movant told her she had paint on her bathing suit and proceeded to take off the bottom of her bathing suit.  Id.  On one of the three or four times K.T. played at the movant's home, she planned to spend the night.  J.A. 732.  Later that night, however, she wanted to go home.  J.A. 733. The movant told her she could not leave because it was too late and her mother might get mad.  Id.  In an effort to persuade her not to leave, the movant suggested she sleep in his room, though K.T.'s

mother still came and picked her up.  <u>Id.</u>  K.T. testified that the
first time she told someone about the movant's behavior was that
night when she left his house; she stated that she told her mother
what the movant had done and why she did not want to go over to his
house anymore.  J.A. 736.

### S.P.

Child witness S.P. was a friend of the movant's daughters.
She testified that she was at his house on one occasion.  The
movant told her that her bathing suit was too tight, J.A. 623, and
then untied it for her and then tied it back.  J.A. 622.  This made
her feel uncomfortable.  J.A. 623.  S.P. testified that the first
person she told about this was her sister, though she did not
remember how long after the fact it was.  J.A. 629-30.  She also
testified that the movant would stare through the blinds at her and
the other girls while they were in the pool.  <u>Id.</u>[8]

### C.A.

C.A. was a friend of the movant's older daughter.  She
testified that she frequently would spend the night at his
residence, and that the movant would take a lot of pictures of her
and the other girls.  J.A. 715.  She identified multiple
photographs of her, including one where she was standing up naked
and covering her genitals with what appears to be a piece of foil.

---

[8]  Gov't Ex. 32 includes numerous photographs, taken between
slats of window blinds, of the various girls in the movant's
pool.

Id. at 719 & Gov't Ex. 32.  With regards to the latter photograph, she testified that it was taken by either the movant or his daughter.  J.A. 720.

### GROUNDS FOR RELIEF

In his 2255 motion, the movant raises five grounds for relief: (1) ineffective assistance of counsel; (2) error in applying obstruction of justice enhancement; (3) error in enhancing offense level pursuant to USSG § 4B1.5(b); (4) failure to raise issues of prosecutorial misconduct re alleged Brady violations; and (5) unreasonable sentence.  ECF No. 303 at 7-13.

In his memorandum, the movant raises a multitude of complaints about his attorneys.  ECF No. 304 at 32-100.  They will be addressed by category.  The undersigned adopts the numbering system developed by the United States in its response.  See ECF No. 332, n.11.  ("For clarity's sake the United States will reference them by number, 1-95, beginning on page 32 and continuing through the last claim on pages 68-72.").

**A. Ineffective Assistance of Counsel**

  **1. Pre-trial claims**

    **a. Failure to investigate**

• Failure to subpoena and present alibi witness whom the movant claims would have testified that he was at his places of employment during time frames in which he was said to be downloading child pornography (Claim # 1).

39

- Failure to interview/identify unnamed witnesses (Claim # 4).

- Unspecified failure to investigate (Claims ## 7, 32).

- Failure to sufficiently investigate and secure information to impeach the testimony of the child witnesses (Claim # 9).

- Failure to investigate and introduce evidence that, according to the movant, the vast majority of the child pornography on his computer was only obtainable from pay sites, which the movant says he did not frequent (Claim # 40).

### b. Failure to meet and confer with him

- Failure to sufficiently meet with the movant and adequately prepare him for cross-examination (Claim # 29).

- Failure to candidly inform the movant as to the strength of the United States' case, so that the movant could make an informed decision on whether to plead guilty (Claim # 95).

### c.  Motion to Suppress Claims

- Failure to challenge probable cause and sufficiently argue the suppression motion (Claims ## 13, 21, 33).

- Failure to challenge what he alleges were falsehoods and false allegations in the search warrant affidavit (Claims ## 15, 16, 17, 18, 19, 35).

- Failure to object to flaws in the warrant application (Claim # 20).

- Failure to object to the fact that the warrant application was stamped by the clerk's office on September 24, 2004, not

previous day when the search occurred (Claim # 23).

• Failure to challenge the execution of the search (Claim # 24).

### d. Other pre-trial claims

• Failure to obtain a transcript of grand jury testimony (Claim # 11).

• Failure to advise Chief Judge Goodwin that the United States was intentionally withholding exculpatory materials, including ones related to child witnesses (Claim # 14).

• The failure of defense counsel to object to Chief Judge Goodwin's denial of a motion for bill of particulars resulted in the equivalent of a trial by ambush (Claim # 22).

• Failure to convince law enforcement to seize and search the computer of Jay Fuller (the movant claims that Fuller planted the child pornography on the movant's computer), and to obtain email correspondence between Fuller and the movant's ex-wife (the movant claims the correspondence discusses framing the movant) (Claims ## 27 & 53).

• Failure to inform Chief Judge Goodwin about the irreconcilable breakdown in the attorney-client relationship (Claim # 30).

• Failure to adequately examine prior to trial documents provided by the United States (Claim # 38).

### 2. Trial Claims

#### a. Third party hacker and forensic evidence claims

• Failure of trial counsel to follow through on the portion of

its opening statement that alleged that a third party hacker had placed child pornography on the movant's computer (Claims ## 2, 12).

- Failure to secure the assistance of Mr. Jason Coombs, who the movant states is a computer security expert who would have testified about the movant's hacker defense and about the flaws of computer forensics (Claim # 3).

- Failure to become sufficiently learned in computer matters (Claim # 8).

- Failure to oppose irrelevant computer image evidence and testimony (Claim # 10).

- Failure to object to and contest certain aspects of testimony of Melinda Cash, the computer expert witness of the United States (Claims ## 25, 37, 41, 42, 45, 46, 47).

- Failure to understand and explain to the jury certain theories possessed by the movant: that the files had been copied, not downloaded; that the file creation and modification dates were, according to the movant, identical; that no program on the movant's computer, according to the movant, had any record of opening or creating the files in question; and that no programs on the movant's computer showed any record of viewing the pictures in question (Claim # 39).

- Failure to inform the jury that, according to the movant, many of the files were created after the modification date (Claim

# 44).

- Failure to object to what the movant states was a limitation on the number of questions from Chief Judge Goodwin that could be asked of Melissa Cash on re-cross-examination (Claim # 48).

- Failure to object to what the movant states was Chief Judge Goodwin's incorrect statement that there were 28 CDs of illegal materials, when the movant states that there were only five, and an allegedly incorrect statement made by Chief Judge Goodwin on the shortcuts to child pornography that were on the movant's computer (Claim # 51).

- Failure to contemporaneously move to strike the testimony of Melissa Cash on the grounds that the United States failed to articulate or prove that her opinions were given to a reasonable degree of certainty or probability; counsel had made this objection at the close of the United States' case (Claim # 52).

- Failure to object to discussions of Melissa Cash and Reylando Anzaldua, the movant's expert witness, regarding the number of images on the movant's computer, and the hacker defense (Claim # 54).

### b. Failure to call witness claims

- Failure to call Melissa Mooney, Lora Silvey, Christian Harper, Janet Moles, and Dee Wright as witnesses at trial (Claim # 5).

- Failure to call significant defense witnesses such as April

Ellison, David R., Jennifer R. and H. R., C.N., L.N., K.S., Tom and Barbara Hicks, Katherine Harlan, Wendy Capece, Sandy Auxier, Joe Hill, Bill Wilson, Tony and Tiffany Mariani, Dave and Jennifer Rodochio, Tim and Denise Hammack, Kelli Chapman, Daniel Urban, C.W., Z.L., Amber Taylor, Brandy (LNU), Sherry, Matthew and Makayla Miller as well as several unnamed teachers and counselors who have expressed information about the reporting of false testimony and intimidating defense witnesses by the government witnesses.  These witnesses:

a. Would have testified to the truthfulness of Movant's testimony as they were present during many of the times in question;

b. Would have rebutted government assertions put forth during the trial;

c. Would have testified as to Movant's behavior while the children were present as being protective and caring, that none of the behavior the government so creatively portrayed ever occurred;

d. Would have testified that the exact opposite behavior was exhibited by the children in question - that they were in fact not afraid of Movant, but loved, trusted and respected him as well as confided in him to the utmost and were, in fact, staying at his house to **GET AWAY** from abuse at their homes, that several of them, particularly K.H. and A.K., expressed these things openly and often, clung to Movant and proclaimed him their protector, expressed their wishes that he could be their father, etc.;

e. Would have testified that the girls themselves took the majority of the pictures and begged Movant to take the majority of the rest, in fact initiating these events with relentless excitement;

f. Would have testified that Movant expressly prohibited them from taking pictures or posing for pictures that were inappropriate, punishing them for doing so;

g. Would testify that he constantly had to make them get dressed when they would "streak" around or

44

otherwise dress inappropriately;

h. Would have testified as to Movant's computer use, having witnessed everything he was involved in, personally perused all of their personal pictures and found them completely appropriate, often printing them out and taking them home;

i. Would have testified that they witnessed Melissa Hicks threatening to set up Movant;

j. Would have testified to observation of Movant's sexual history, noting that his interests have always lay in completely developed women, always either older than himself or within two years of his age, and certainly not in children. That his love for children was always completely wholesome and fatherly;

k. Would have testified as to Movant's behavior toward them being completely opposite of that so dishonestly portrayed by the government (in the case of other children who could have testified);

l. Would have contradicted false assumptions left unchallenged as to "other bad acts";

m. One would testify that she was on the phone and overheard Melissa bragging about planting child pornography on his computer and would call the FBI if he did not turn the kids over to her.

n. Several would testify that they were at Movant's house nearly every day and never witnessed anything inappropriate, in fact, the exact opposite;

o. Several teachers would have testified as to two of the government witnesses making similar, proven false, allegations against others;

p. Would have testified to the beating of K.C. at school when she refused to "help them lie";

q. Would have testified that the children admitted to being coerced by either the government, their own parents or Melissa Hicks herself to falsely testify;

r. Would have testified to the government witnesses bragging about getting "special treatment" for lying and making false statements;

s. Would have testified about numerous occasions where government witnesses lied or made false allegations in other instances;

t. Would have testified as to government witnesses engaging in similar behavior that was prohibited by Movant at their own homes and those of others;

u. Would have testified as to Movant's reporting and seeking advice on suspected repeated intrusions

45

into his computer system by a third party (with documented evidence thereof);
v. Would have testified as to the government threatening or intimidating them in order to try to deter them from testifying[.]

(Claim # 6) (ECF No. 304 at 34-36).

### c. Failure to challenge child witness testimony

- Failure to challenge what the movant argues was "coached" testimony by child witnesses (Claim # 26).

- Failure to object to statements made by CPS worker Tina Mitchell regarding what the movant claims were contradictory statements made by child witness K.C. (Claim # 55).

- Failure to object to AUSA Forbes' summary [out of the presence of the jury] to Chief Judge Goodwin of the expected testimony of child witness A.K., which AUSA Forbes incorrectly stated would include incidents where the movant touched her stomach and back while he thought A.K. was asleep (Claim # 56).

- Failure to object to various allegedly false aspects of the testimony of child witness S.P. (Claims ## 57-62).

- Failure to timely file a motion under Federal Rule of Evidence 412 requesting that the movant be allowed to cross-examine child witness K.C. on her delayed reporting of abuse in the instant case when she had not delayed reported other alleged instances of abuse (Claim # 65).

- Failure to object to various allegedly false aspects of the testimony of child witness K.C. (Claims ## 63-64, 66-82).

- Failure to object to various allegedly false aspects of the testimony of child witness C.A. (Claims ## 83-84).

- Failure to object to various allegedly false aspects of the testimony of child witness K.T. (Claims ## 85-89).

- Failure to object to various allegedly false aspects of the testimony of child witness A.K. (Claims ## 90-94).

### d. Other trial claims

- Failure to object to unspecified improper commentary by the United States during direct and cross-examination regarding the movant's truthfulness while testifying (Claim # 28).

- Failure to object to specified and unspecified improper remarks made by AUSA Forbes (Claims ## 31, 36, 49).

- Failure to challenge the representative sample of photographs used by the United States (Claim # 43).

- Failure to object to the reasoning of Chief Judge Goodwin in his denial of the movant's motion for a directed verdict (Claim # 50).

### 3. Speedy Trial Claim

The movant argues that his counsel was also ineffective for failing to move to dismiss the superceding indictments filed against him, as he apparently believes that they were not filed within thirty days of the date on which he was arrested or served with a summons or complaint (Claim # 34).

### 4. Sentencing Claims

The movant makes three claims for relief on sentencing issues. First, he argues that Chief Judge Goodwin erred when he applied, pursuant to U.S.S.G. § 3C1.1, an enhancement for obstruction of justice.  See ECF 304, at 77-84.  Next, he contends that his base and adjusted offense levels were unconstitutionally enhanced pursuant to U.S.S.G. §4B1.5(b).  Id. at 84-95.  He also asserts that Chief Judge Goodwin imposed an unreasonable sentence.  Id. at 98-100.

## B. Prosecutorial Misconduct Claims

The movant attributes a variety of misconduct to the United States.  He alleges that the United States failed to disclose exculpatory materials (ECF No. 304 at 39, 95-97), coached witnesses (id. at 43), and made various improper statements at trial. Specifically, he claims in his Supplemental Brief that

- Assistant United States Attorney ("AUSA") L. Anna Forbes ("AUSA Forbes") inappropriately described him as a "dedicated collector of child pornography." (ECF No. 320 at 5.)

- AUSA Stephen Grocki ("AUSA Grocki") told the jury that the Movant had told a "bold lie" when he testified about allegedly taking a photo of CA.  Id.

- AUSA Forbes inappropriately exhorted the jury to "do its job." Id. at 7-8.

- AUSA Forbes made numerous assertions that were not supported by the record.  Id. at 6, 7, 9, 10.

48

- The United States inappropriately implied a personal belief by stating that the movant was guilty. <u>Id</u>. at 10.

- AUSA Forbes inappropriately described the movant as a "monster." <u>Id.</u> at 11.

- AUSA Forbes prejudicially noted, in her opening statement, "that's the nature of this beast." <u>Id.</u>

Additionally, the movant claims that

- The United States permitted, encouraged, and condoned the false and exaggerated testimony of its expert witness, Ms. Melinda Cash. <u>Id.</u> at 13-17.

- The United States similarly allowed the false testimony of various child witness. <u>Id.</u> at 17-19.

- The United States failed to investigate known inconsistences in its witnesses' testimonies. <u>Id.</u> at 20.

## <u>ANALYSIS</u>

### Ineffective Assistance of Counsel

The Supreme Court addressed the right to effective assistance of counsel in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), in which the Court adopted a two-pronged test. The first prong is competence; movant must show that the representation fell below an objective standard of reasonableness. <u>Id.</u> at 687-91. There is a strong presumption that the conduct of counsel was in the wide range of what is considered reasonable professional assistance, and a reviewing court must be highly deferential in scrutinizing the

performance of counsel.  <u>Id.</u> at 688-89.

> In order to meet the first prong, movant must
> identify the acts or omissions of counsel that are
> alleged not to have been the result of reasonable
> professional judgment.  The court must then
> determine whether, in light of all the
> circumstances, the identified acts or omissions
> were outside the wide range of professionally
> competent assistance ... [C]ounsel is strongly
> presumed to have rendered adequate assistance and
> made all significant decisions in the exercise of
> reasonable professional judgment.

<u>Id.</u> at 690.  As the Supreme Court recently emphasized,

> [t]here are . . . countless ways to provide
> effective assistance in any given case.  Even the
> best criminal defense attorneys would not defend a
> particular client in the same way.  Rare are the
> situations in which the wide latitude counsel must
> have in making tactical decisions will be limited
> to any one technique or approach . . . . Counsel
> was entitled to formulate a strategy that was
> reasonable at the time and to balance limited
> resources in accord with effective trial tactics
> and strategies.

<u>Harrington v. Richter</u>, 131 S. Ct. 770, 788-89 (2011).  "[E]ven the

most experienced counsel may find it difficult to resist asking

whether a different strategy might have been better[.]"  <u>Id.</u> at

790.  "But which strategy might have been best is not the pertinent

inquiry; instead, we ask whether the strategy counsel chose was

objectively reasonable."  <u>DeCastro v. Branker</u>, 642 F.3d 442, 451

(4th Cir. 2011) (citing <u>Harrington</u>, 131 S. Ct. at 790).

The second prong is prejudice; "[t]he defendant must show that

there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been

different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. The court may determine the prejudice prong prior to considering the competency prong if it is easier to dispose of the claim on the ground of lack of prejudice.  <u>Id.</u> at 697.

**<u>Prejudice to the Movant - Counts One and Two</u>**

The United States argues that the instant 2255 motion should be summarily denied due to a lack of prejudice.  ECF No. 332 at 15-17.  It contends that, even assuming <u>arguendo</u> that the movant's counsel was deficient, the movant was not prejudiced due to the fact that the evidence of his guilt on the production of child pornography counts was overwhelming and the movant's other sentences were all run concurrently to Count One, the first production of child pornography count.  Therefore, the United States asserts, any failures by his counsel with regards to the hacker defense are irrelevant, inasmuch as it is only applicable to the vast amounts of internet child pornography that the movant had on his computer.  <u>Id.</u>

The movant vigorously contests the government's argument that his motion should be summarily denied.  <u>See</u> ECF No. 346 at 3-6a. He argues that such a dismissal is premature, and that he is entitled to an evidentiary hearing.  <u>Id.</u> at 5.  He argues that the Rule 56, Fed. R. Civ. P., summary judgment standard applies, and that his allegations have created a genuine issue of material fact,

or at least have created the need for an evidentiary hearing.  Id.
He does not, however, point to a single material fact as to Counts
One and Two which is in dispute.

For the purpose of evaluating the United States's contention
that the movant cannot show prejudice, the undersigned will first
address the movant's ineffective assistance of counsel claims
related to Counts One and Two, the production counts.  The
undersigned will address the movant's claims which are unrelated to
Counts One and Two thereafter.

The undersigned has provided extensive quotations of the
witnesses who testified about Counts One and Two (Government
Exhibits 31 and 33).  They are A.K., the movant, and his daughters.
Their testimony is largely consistent.  Kr.H. (or the movant) took
the two photographs of A.K. with the movant's camera on June 12,
2003; the movant was present in the residence when they were taken;
the photographs were downloaded to the movant's computer; the
photographs were not deleted from the computer and were found by
the FBI after September 24, 2004, more than fifteen months later.
Those photographs, and the other photographs from Government
Exhibit 32, had the same file name/structure, AP.A, as some of the
other child pornography in his computer.  The movant's defense is
that he did not take the two pictures; Kr.H. took them.  PSR, ECF
No. 296 [sealed], ¶¶ 81, 83, at 16.  His defense is irrelevant;
Counts One and Two did not charge the movant with taking the

52

photographs; he was charged with permitting the conduct for the purpose of the photographs being taken.

After repeated and meticulous review of the transcripts and evidence from the movant's trial, the undersigned respectfully proposes that the presiding District Judge **FIND** that the movant cannot demonstrate that he was denied effective assistance of counsel with regard to the evidence which resulted in his convictions on Counts One and Two. The sentences on the other counts of conviction were run concurrently to the sentence imposed for Count One; thus it is arguable that the movant cannot demonstrate that he has suffered any prejudice. However, the movant raises claims of ineffective assistance of counsel which have an indirect bearing on the entire case; thus the undersigned will address the multitude of complaints he makes against his lawyers.

## 1. Pre-trial claims

## a. Failure to investigate (listed at pages 39-40)

First, he claims that his counsel failed to subpoena and present alibi witnesses who, the movant claims, would have testified that he was at his places of employment during the time frames in which he was said to be downloading child pornography. (Claim # 1). The United States argues that this claim should be rejected as vague and conclusory. It also notes that

> [t]he defense issued three trial subpoenas seeking
> employment records from to [*sic*] Pizza Hut, Papa

> Johns and Pomeroy Computers. [# 181-183]. These
> records were not introduced at trial. The likely
> reason is that the records were of no consequence
> to the issues in a trial where the child
> pornography files had 150 different creation dates.
> The futility of an alibi defense is further
> evidenced by the fact that Defendant ceased working
> at Pomeroy in April 2001 and worked as a Pizza
> delivery man only on the weekends.

ECF No. 332 at 25 n.14.

> The movant disagrees.
>
> It is worth noting that the United States has now
> drawn its own fatuitous [sic] conclusions by
> stating, "the likely reason (for not using the
> employment records) is that the records were of no
> consequence to the issues in a trial where the
> files had 150 different creation dates." This type
> of rationale is clearly ridiculous and is more
> parallel to the United States' definition of
> "conclusory." All-in-all, it would obviously appear
> that AUSA Forbes is attempting to defend and
> explain away trial counsel's egregious
> representation when failing to use employment
> records that would corroborate his whereabouts
> during the time frame when the hackers penetrated
> his computer. It would have been simple for counsel
> to introduce these time sheets, especially given
> the fact that Movant took the time to write out a
> list of all the times that did, indeed, correspond
> to the files in question, some of which prove
> beyond any shadow of a doubt that Movant could not
> possibly have been at the computer to create the
> files. Additionally, there were literally
> uncountable tens of thousands of files within the
> 900 archives, astonishingly, that Movant could not
> possibly have been responsible for.

ECF No. 346 at 46-47.  Exhibit 2 of the movant's reply includes a

handwritten and somewhat illegible list of files that the movant

claims were created when the movant says that he could not have

been using his computer: when he was at work (106 files); when his

children were at his house (481 files); and late at night (237 files).  ECF No. 346-1, at 14-22.

The movant also alleges that his counsel failed to interview/identify unnamed witnesses (Claim # 4), and he further alleges an unspecified failure to investigate (Claim # 7, 32).  The United States again argues that these claims should be rejected as vague and conclusory.

Finally, the movant claims a failure to investigate and introduce evidence that, according to him, the vast majority of the child pornography on his computer was only obtainable from pay sites, which the movant says he did not frequent.  Again, the United States asserts that this claim is vague and conclusory.

The undersigned proposes that the presiding District Judge **FIND** that all of these claims are without merit.  First, even if the movant is correct that 106 files were created while he was at work – and this is doubtful given that the movant has presented no evidence other than his own word — such a detail is irrelevant given that there were 900 similar files on his computer.  The assertion that the movant could not have been responsible for other files because, according to his similarly unsupported assertions, it was late or his children were present, is similarly baseless.  The Sixth Circuit has commented as follows:

> Knowing possession of child pornography in violation of § 2252(a)(4)(B) is not a crime that happens to a defendant.  It is not a crime of inadvertence, of pop-up screens and viruses that incriminate an innocent person.

> Possession of child pornography instead becomes a crime when a defendant knowingly acquires the images – in this case, affirmatively, deliberately, and repeatedly, hundreds of times over, in a period exceeding a year.

United States v. Bistline, ___ F.3d ___, No. 10-3106, slip op. at 10, 2012 WL 34265 (6th Cir. Jan. 9, 2012).  The United States also correctly argues that the movant's other claims are vague and conclusory.

**b. Failure to meet and confer with him (listed at page 40)**

The movant claims that his counsel failed to sufficiently meet with him and prepare him for cross-examination (Claim # 29).  He also claims that his counsel failed to candidly inform him about the strength of the United States' case, so that he could make an informed decision whether to plead guilty (Claim # 95).  The United States responds that

> [a]ssuming for the sake of discussion that defense counsel's communications with the Defendant were in fact infrequent, the Defendant offers nothing to prove that additional contact with him would have had any impact on the verdict.  See Lenz v. Washington, 444 F.3d 295, 303 (4th Cir. 2006) (counsel's infrequent visits with Defendant were not prejudicial because the Defendant failed to show that additional meetings would have changed the outcome of the case).  To the extent the Defendant claims he was "never given an incentive to explore meaningful plea negotiations," [#304, p. 69], this assertion is particularly suspect because the Defendant continues to the present day to maintain his innocence and, as such, could not enter a valid guilty plea.

ECF No. 332 at 27-28.

The movant disagrees in his reply at great length.  See ECF

56

No. 346 at 53-57.  In part, he claims that the United States has no way of knowing what could have been accomplished with more consultation, and he describes his cross-examination as "like a lamb being led to the slaughterhouse." Id. at 53.  He states that more consultation could have prevented the errors he now alleges. Id.  The movant argues that with more consultation, he may have realized that, his innocence aside, he would have had to accept a plea agreement in order to minimize his prison time.  Id. at 54-55.

The undersigned proposes that the presiding District Judge **FIND** that these claims lack merit.  Prior to his testimony at trial, the movant told Chief Judge Goodwin that he was fully aware of "the risks and perils of taking the stand and [being] subject to cross-examination." See J.A. 488-9.  To the extent that the movant ignored the advice of counsel by testifying and is now stricken with remorse, he has only himself to blame for his decision to risk, in his words, the abattoir of cross examination.  See also 5 John Henry Wigmore, Evidence in Trials at Common Law § 1367, at 32 (James H. Chadbourn ed., 1974) (stating that cross examination "is beyond any doubt the greatest legal engine ever invented for the discovery of truth.").  The movant also offers nothing to prove that any additional contact with his counsel would have had any impact on the verdict; the errors he cites are not actual errors. There is no evidence to support his assertion that his counsel did not candidly advise him about the strength of the government's case

57

against him.

**c. Motion to Suppress Claims (listed at pages 40-41)**

The United States objects to review of the claims relating to the motion to suppress, arguing that the movant had a fair and full opportunity to litigate these claims pretrial and on direct appeal, and did so. ECF No. 332 at 26-27.

In rebuttal, the movant says that the motion was not zealously argued, as was required by the Sixth Amendment.  ECF No. 346 at 49. The movant alleges that, because the United States relied upon witness statements that the movant claims were either recanted or otherwise inaccurate, the search warrant application and affidavit did not provide sufficient reliable facts to create probable cause for the discovery of child pornography.  Id. at 51-52.

When the government has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a prisoner cannot be granted collateral relief on the ground that evidence obtained via an unconstitutional search and seizure was introduced at his trial. Stone v. Powell, 428 U.S. 465, 494 (1976).  This rule does not apply to Fourth Amendment claims that were defaulted due to constitutionally ineffective assistance of counsel.  Kimmelman v. Morrison, 477 U.S. 365, 373-81 (1986).

The movant's Fourth Amendment claims are without merit. First, he has already challenged probable cause pretrial and on appeal.  The  movant's argument that the date stamp on the search

warrant application equates with fraud is utterly frivolous, inasmuch as the stamp only indicates the day that the application was received by the clerk's office following the application's approval by the undersigned.  His other arguments are also deficient, inasmuch as they rely upon self-serving allegations with no support other than the movant's word.  The movant demonstrates neither error by his counsel nor cause and prejudice, and these claims accordingly fail.

**d. Other pre-trial claims (listed at page 41)**

The movant makes several other pre-trial claims, as listed above.  The United States summarily rejects them, arguing that they "lack legal merit, concern trivial and inconsequential factual matters, or cannot be said to have a reasonable probability of affecting the outcome of the trial."  ECF No. 332 at 28.  The movant makes no specific rebuttal to this argument in his reply. The undersigned agrees with the government's argument that all of these claims lack merit, and proposes that the presiding District Judge so **FIND**.

**2. Trial Claims**

**a. Third party hacker and forensic evidence claims**

**i. Third party hacker witnesses (listed at page 41-43)**

Among all the ineffective assistance claims raised by the movant in his 2255 motion, perhaps the most emphatic one relates to the inability of his counsel to have H.R. testify at trial, which

59

he describes as a failing of "monumental importance."  ECF No. 304
at 13.  (Claim # 2).  The movant discusses this claim extensively.
See ECF No. 304 at 13-16, 25-26, 30-32.  He deems this failure as
ineffective assistance of counsel, as H.R.'s testimony was
necessary for the movant to present his hacker defense.  Id. at 14.

> [T]his testimony was not merely important but constituted
> the entire theory of the defense, Movant Hicks was
> incalculably prejudiced by his counsel's uncanonical
> actions, error and judgment.  Not only did Movant's
> defense counsel fail to present his proposed defense,
> counsel's transgressive lawyering infinitely compounded
> the prejudice by ensuring the jury was cognizant of
> Movant Hicks' failure to present his third party guilt
> defense.

Id. at 26.

> Trial counsel more or less conceded that the government
> could prove every other requisite element of the offenses
> and "promised" it would provide evidence that the
> presence of images depicting minors engaged in sexual
> conduct had been planted on Movant Hicks' computer by
> someone else without his knowledge, consent or
> endorsement.  It was known fact to trial counsel that
> H.R.'s testimony was the strongest evidence of third
> party guilt, but was also either known or should have
> been known to be potentially critical to the trial
> court's decision whether to permit the introduction of
> the other evidence of third party guilt.  Needless to
> say, trial counsel's failure to produce H.R. to testify
> cannot be rationalized as a tactical or strategic
> decision.  It was a clear-cut example of ineffective
> assistance of counsel under the standard set forth in
> Strickland and an evident failure to perform reasonably
> in defense of Movant Hicks and was conspicuously
> "prejudicial" to the verge of being fatal to Movant's
> defense . . . . Notwithstanding the fact the entire
> defense would be excluded without the testimony of H R,
> trial counsel unwisely declined to request relief from
> the trial court necessary to ensure his presence and
> testimony.

Id. at 31-2.  (emphasis in original).  The movant also states that

H.R.'s testimony would have also opened the door to testimony from other witnesses regarding other bad acts of Ms. Silvey. Id. at 15.

The United States disagrees in its response.

> Although some of the evidence defense counsel promised was not in fact presented at trial, the estranged ex-wife/hacker theory was pursued at trial (e.g. cross-examination of the prosecution's computer expert, J.A. 315-55; examination of his own computer expert, J.A. 436-68; and the Defendant's own testimony, J.A. 494-505, 523-30). Notably, defense counsel did not specifically reference the so-called "smoking gun" email in his opening statement or the child witness, H.R., that had not been subpoenaed, and so, the jury could not have considered that as an unfulfilled promise . . . . . In sum, defense counsel pursued the hacker theory promised in opening statement at trial; to the extent that some of the details of what his counsel promised in opening statement were not delivered, that was a professionally reasonable strategical decision that, in light of the overwhelming evidence of the Defendant's guilt, was of no consequence to the end result.

ECF No. 332 at 28-29.

In his reply, the movant reiterates his earlier arguments. See ECF No. 346 at 20-25.

The undersigned proposes that the presiding District Judge **FIND** that the movant's claim with regards to the testimony of H.R. is without merit. Evidence at trial convincingly proved that the movant's hacker defense had no basis in fact, thus rendering any testimony by H.R. moot. As noted earlier, the movant's computer contained no viruses nor any evidence that it had been hacked into by a remote computer; his operating system was actually capable of detecting whether any other computer had connected to the computer;

the third hard drive did not permit sharing; the fourth drive was not physically attached to the computer and, thus, its files could not be accessed by any computer; and there was no evidence of a necessary lap drive on the movant's computer.

The impossibility of a hacker aside, the movant still was able to raise that possibility via his cross-examination of Ms. Cash and the direct testimony of Mr. Anzaldua.  As the United States correctly notes, moreover, the "smoking gun" email that was allegedly seen by H.R. was never specifically mentioned to the jury, thus lessening the impact of H.R.'s absence from the trial. To the extent that H.R.'s testimony might have been used to offer other allegedly unflattering evidence about Ms. Silvey, such evidence would have been irrelevant.

### ii. Other forensic claims (listed at pages 42-43)

The movant also argues that his counsel was ineffective for failing to object to and contest certain forensic aspects of his case.  Some of these claims are framed in terms of his counsel failing to challenge the testimony of Melinda Cash, and others are framed as trial errors.

With regards to Ms. Cash, he takes issue with her testimony regarding the size of his hard drive (Claim # 25); the Wiper Wizard and PowerArchiver programs found on his computer (Claim ## 37 and 42); the method used to access files on his computer (Claim # 41); various dates associated with files on his computer (Claim ## 45

62

and 46); and the "my shared folder" on his computer (Claim # 47).

While some of the movant's other forensic claims are duplicative of his claims regarding Ms. Cash, others are not. He alleges that his counsel failed to secure the assistance at trial of Mr. Jason Coombs, a computer security expert (Claim # 3); to become sufficiently learned in computer matters (Claim # 8); to oppose irrelevant computer image evidence and testimony (Claim # 10); to object to the limitation of re-cross-examination of Melissa Cash (Claim # 48); to object to certain statements made by Chief Judge Goodwin (Claim # 51); to timely move to strike the testimony of Melissa Cash because her opinions were not given to a reasonable degree of certainty or probability (Claim # 52); to object to testimony by Ms. Cash and Mr. Anzaldua regarding the number of images on the movant's computer (Claim # 54).

The movant then spends fifteen pages in his reply further criticizing the testimony of Ms. Cash. See ECF No. 346, at 26-41. In pertinent part, he argues that computer forensics is not a scientific field of study, and that it has no place in a criminal trial. He also alleges that the evidence at trial did not disprove his hacker theory; that Ms. Cash's examination of his computer was not carried out in an objective manner; that her examination and analysis did not show how the child pornography got on his computer, and that it did not eliminate the possibility that it had been planted. The movant states that there was no adult

pornography evidence on his computer, which he argues would normally be found on the computer of a child pornography collector. He also challenges the veracity of assorted arguments made by the United States in its response to his 2255 motion.

In response, the United States argues that many of these claims are proven incorrect by the transcript. ECF No. 332 at 25, 32. It further states that the movant's counsel vigorously cross-examined Ms. Cash; made objections on the sample of child pornography photographs; and did, in fact, arrange for a computer expert to testify for the movant— namely, Mr. Anzaldua. Id. It states that the other claims are vague and conclusory, of limited probative value, contradicted by the movant's own expert, irrelevant, and, even if true, would not have changed the outcome of the movant's trial. Id. at 33.

Upon extensive review of the transcript of Ms. Cash's testimony and other pertinent parts of the trial, the undersigned proposes that the presiding District Judge **FIND** that all of the movant's claims about forensic issues are without merit. First, as stated earlier, the hacker defense is totally unsupported by the evidence. The movant also writes extensively about how the creation date of some of the child pornography files was later than the modification date. However, this discrepancy does not mean that the files were therefore planted by a hacker. Testimony at trial disproved this theory. Referring to the pthcporn video that

64

was found on the movant's computer, Ms. Cash testified as to the following:

> Q. And for the share date in the same file?
> A. September 11th, 2004.
> Q. For the last share date, could you just repeat what you said that indicates?
> A. It indicates the last time the file was shared.
> Q. Describe, I guess, what it means when the last time the file was shared.
> A. It either means that the file was moved out of the share folder so it's no longer there available for sharing -- within Kazaa you can only get files from somebody if they're still in that shared folder. So, it either indicates that the file has been moved out or deleted, or - -I'm sorry.  You can also within Kazaa stop the sharing.
> Q. Okay. So, if a file came into the share folder via download and was moved to another part of the hard drive, would that be represented in the last share date?
> A. Yes.

J.A. 225-26.  A file downloaded via Kazaa-Lite would initially go to the default share folder.  J.A. 220.  These details are important, because Ms. Cash earlier had testified that "[the] [c]reation date is when the file was put in that location.  The modified date is the last date that the file was changed or modified.  And the access date was the last time that the file was accessed."  J.A. 184.  Therefore, a creation date that is later than the modification date only refers to the date that the movant transferred a file from his shared folder—where the file originated following its download—to the folder where Ms. Cash found it.  It is not the date that the file was actually created on his computer. In fact, in the portion of her testimony discussing the photographs

of children taken with the movant's camera, Ms. Cash noted that the modification date for those photographs was the actual date of creation, as the last time a photograph can be changed/modified was when it was taken by the camera.  J.A. 302.  In her testimony, Ms. Cash also was directly asked about file access dates being the same as the creation or modification dates, another issue raised by the movant; she said that this would "not necessarily" be significant. J.A. 316.

The movant's argument about the lack of adult pornography on his computer is baldly false.  Such pornography was indeed found within the archive files of his computer.  See J.A. 190.  The undersigned has considered the movant's other claims, and proposes that the presiding District Judge **FIND** them to be without merit.

**b.  Failure to call witnesses (listed at pages 43-46) and**

**c.  Failure to challenge child witness testimony (listed at pages 46-47)**

The movant claims that his counsel was ineffective by failing to call certain named witnesses who would have testified as to unstated matters (Claim # 5), and numerous witnesses who would have testified to the movant's truthfulness and rebutted the assertions of the United States and the child witnesses (Claim # 6).  The United States, in its response, argues that most of the allegations in Claim # 6 are non-specific; for the allegations that are specific, the government argues that cross-examination by the

movant's attorneys uncovered much of what the movant states these witnesses would have contributed.  ECF No. 332 at 30-31.  As to the remaining allegations, the United States claims, "the proffered evidence would have been cumulative, inadmissible under witness impeachment rules, irrelevant, of questionable probative value and cannot be said to present a reasonable probability that the outcome of the trial would have been any different."  ECF No. 332 at 31. The movant disagrees, without specificity, in his reply.  See generally ECF No. 346.

The movant alleges that his counsel failed to sufficiently investigate and secure information to impeach the testimony of child witnesses S.P., K.T., A.K., and C.A., which the movant claims was false.  (Claim # 9).  He also alleges that counsel failed to advise Chief Judge Goodwin that the United States was intentionally withholding exculpatory materials, including some related to child witnesses (Claim # 14).[9]  The United States replies that these claims should be rejected as vague and conclusory.  ECF No. 332 at

[9]  On January 13, 2011, the movant filed a motion for discovery seeking, in part, the undisclosed exculpatory materials that he believed were in the United States' possession.  ECF No. 328.  In its supplemental response to this motion, ECF No. 351, the United Stated included a nineteen page exhibit detailing the evidence previously provided to the movant.  See id. at Ex. 1.  The undersigned denied the movant's discovery motion on June 22, 2011, ECF No. 353, and Judge Copenhaver denied it on August 11, 2011.  ECF No. 357.  The movant filed an interlocutory appeal, ECF No. 358, on Judge Copenhaver's denial of this motion and the movant's motion for leave to submit photographs of child witnesses, ECF No. 347.  The Fourth Circuit dismissed this appeal on December 20, 2011.  ECF No. 365.

24-26.  In his reply, the movant repeats his earlier statements.
See generally ECF No. 346.  He also argues in his reply that there
was no evidence at trial that he was in or near the bathroom when
his daughter took the photographs of A.K., and that he was unaware
of the photographs until notified by Ka.H.   Id. at 15-16.

Finally, there are the myriad complaints by the movant that
his counsel failed to challenge various aspects of the child
witnesses' testimony, which the movant argues was false.  (Claims
## 26 & 55-94).  In response, the United States simply argues:

> The majority of these claims are nothing other than
> the Defendant disagreeing with the testimony that
> these children offered. The fact that the Defendant
> did not like what the children said does not make
> their testimony false. More to the point, however,
> is the fact that his counsel engaged in reasonable
> cross-examination of the children – a difficult and
> sensitive task for any litigator. J.A. 626-36,
> 678-708, 720-22, 734-36, 752-56.  To the extent
> that his counsel chose to refrain from bullying the
> children, raising his voice, or pounding the
> witness stand, that decision was a professionally
> reasonable judgment clearly aimed at minimizing any
> further alienation of a jury that had already heard
> overwhelming evidence of the Defendant's guilt.

ECF 332 at 33-34.

> The movant disagrees.

> With all due respect, when a witness testifying in
> a court of law confers false, untruthful and
> deceptive prevarications (perjury) upon the Court,
> jury and the attorneys representing the defendant,
> it's politely described as a "disagreement" by the
> United states. If Movant had suborned perjury as
> did the witnesses for the government, he'd very
> likely be facing perjury charges in federal court.

68

How could the government and the Court not take this seriously, given the solid, undisputable evidence?

AUSA Forbes has attempted to artfully explain away trial cocounsel's ineffectiveness as "reasonable" cross-examination of the witnesses. Movant readily concedes trial cocounsel embarked upon a difficult and sensitive task when cross-examining the child witnesses, nonetheless, Mr. Giatras' and Mr. Preservati's primary objective was to prove Movant's innocence, not worrying about hurting a witnesses feelings when they aren't telling the truth. Trial cocounsel employed "delicate" tactics as opposed to being straightforward, emphatic and intent, therefore failing to reap the desired results. A perfunctory review of the meritorious grounds found in the aforementioned paragraphs and pages of the § 2255 conscientiously describe, with possibly the exception of #26 found on page 43, **each and every detail** of what the child witnesses falsely testified to during the trial.

It was trial cocounsel's responsibility and duty to defend his client in a zealous manner by gently and carefully probing the witness asking specific questions prepared the day before in a manner that would reveal the truth while simultaneously refuting and disproving the mendacious accusations being directed at their client. See **Strickland**, supra. Simply put, the defense attorneys in the present case were not appointed to represent Movant so they could become friends, acquaintances or companions of these child witnesses, they were adversaries representing the government put on the stand to recite "coached" testimony implanted in their young minds by immoral agents of the government merely attempting to put a feather in their caps by securing a conviction against an alleged pedophile. When in fact, this so-called pedophile and child abuser was actually a loving, devoted and caring man who protected all children who came across his path.

The United States would now like for this Court to somehow believe these are not matters of importance but for the most part are trivial and not worth rebutting or pursuing. Further, AUSA Forbes'

assertions that Movant did not like what the children said is 100% correct. Movant respectfully responds to this conclusory statement by declaring, "I do not know anyone who condones, likes or takes pleasures in being the target of vicious and uncorroborated lies, especially when their lives and future are being placed in jeopardy by them." The interminable averments and seriously flawed opinions of AUSA Forbes in which she continually describes Movant's meritorious grounds for relief as being vague, meritless, redundant or conclusory can best be characterized as inversed thinking on her part.

Movant respectfully opines that if trial cocounsel had been adequately prepared for the cross examination of the child witnesses, there would be no need for bullying the witnesses, raising his voice, or pounding the stand as AUSA Forbes alludes to. Both attorneys being well-seasoned, veterans of the bar, would in all probability possess a great deal of experience in cross-examining such witnesses. Thus, the ineffectiveness of trial cocounsel should not be confused with "reasonable" cross-examination of the children. Any attorney competently defending his client would have been well aware of the necessary methods in which to successfully impeach a witness, no matter who they are - without exhibiting overzealous bullying and frightening of the witness.

Moreover, not only was trial cocounsel ineffective during the cross-examination phase of Movant's trial, he also knowingly allowed government witnesses to suborn perjury during their testimony. If, trial cocounsel had impeached the witnesses in question there is a reasonable probability that the jury would have reached an entirely different verdict.

ECF No. 346, 64-66 (emphasis in original) [*sic* throughout].

Scattered throughout his filings, the movant claims the existence of recanted, altered, changed and exculpatory witnesses' statements, particularly of the child witnesses who testified

against him.  The presentence report, ECF No. 296 [sealed], at 11-13, provides some indication of conflicts in the statements given by child witnesses; however, the statements reported by the probation officer tend to implicate the movant in inappropriate sexual contact with the girls and do not exculpate him.[10]  It appears to the undersigned that all of the statements given by child witnesses were provided to defense counsel prior to the beginning of movant's trial.  See n.9.

The evidence as to Counts One and Two was basically conceded by the movant, although he does not appear to recognize that the identity of the photographer is ultimately irrelevant.  Counts One and Two charged the movant with knowingly permitting A.K. to engage in sexually explicit conduct for the purpose of producing visual depictions of that conduct; he was not charged with taking the photographs himself.  While the movant claims that evidence of his involvement with the photographs is lacking, the Fourth Circuit has already held that

> sufficient evidence supported the conclusion that Hicks knowingly permitted the minor to engage in sexually explicit conduct for the purpose of producing a visual depiction.  The Government produced myriad evidence that Hicks cultivated an environment where prepubescent girls

---

[10]  The statements indicate that Hicks took the photographs of A.K. in the bathtub, insisted on helping the girls dress in bathing suits, walked around in his underwear in the girls' presence, lay next to them in bed, removed some of their clothing, watched "nasty movies," masturbated when the girls were at the residence, repeatedly walked into the bathroom while they were bathing, and rubbed their backs.  PSR at 11-13.

> were encouraged to dance and pose in various states of
> undress in front of cameras.

Hicks, 307 Fed. Appx. at 760-61.   To extent that the movant
complains about how his attorneys handled cross-examination, their
strategy was an objectively reasonable attempt to avoid alienating
the jury and to prevent introduction of prejudicial evidence.   The
undersigned proposes that the presiding District Judge **FIND** that
the movant's claims relating to child and other witnesses lack
merit.

### d. Other trial claims (listed at page 47)

Two of the claims, involving improper commentary and remarks
by the United States, are addressed in the section on alleged
prosecutorial misconduct.   The claim that his counsel failed to
challenge the representative sample of photographs used by the
United States is false, see J.A. 262-65, and the other claim is
without merit, and the presiding District Judge should so **FIND**.

### 3. Speedy Trial Act Claim (page 47)

The Speedy Trial Act, 18 U.S.C. § 3161(b), requires that an
indictment be filed within thirty days of a defendant's arrest or
service with a summons.   This claim is particularly muddled.   In
one sentence, the movant claims that his attorneys were ineffective
because they failed to move to dismiss the superceding indictments
which were filed more than thirty days after his initial arrest on
the original indictment (February 17, 2005).   ECF No. 304 at 45.
In the next sentence, the movant asserts that they were ineffective

for not moving to dismiss the counts which were filed more than thirty days after his arrest "on the complaint" (which occurred on February 16, 2006). Id. at 46. The movant has a fundamental misunderstanding of the Speedy Trial Act. The original indictment was returned on February 17, 2005, and the movant was promptly arrested and released on bond. Thereafter, the applicable provisions were 18 U.S.C. §§ 3161(c)(1) and (h), relating to the start of trial and excludable periods of delay. The movant and his attorneys repeatedly filed motions to continue the trial. The motions were granted, noting excludable periods of delay pursuant to § 3161(h). The fourth superseding indictment was returned on March 7, 2006, less than thirty days after his arrest on the complaint. There was no Speedy Trial Act violation, and the presiding District Judge should so **FIND**.

## 4. Sentencing Claims (page 48)

It is well-settled that 2255 motions are limited in their applicability to sentencing issues.

> Barring extraordinary circumstances, however, an error in the application of the Sentencing Guidelines cannot be raised in a § 2255 proceeding. Section 2255 provides relief for cases in which the sentence was in excess of the maximum authorized by law. Thus, while § 2255 applies to violations of statutes establishing maximum sentences, it does not usually apply to errors in the application of the Sentencing Guidelines.

United States v. Pregent, 190 F.3d 279, 283–84 (4th Cir. 1999) (internal quotations and citations omitted); see also United States v. Mikalajunas, 186 F.3d 490, 496–97 (4th Cir. 1999) ("the mere

73

misinterpretation or application of a guideline provision generally does not amount to a miscarriage of justice that warrants relief under § 2255."). Moreover,

> [i]n order to collaterally attack a conviction or sentence based upon errors that could have been but were not pursued on direct appeal, the movant must show cause and actual prejudice resulting from the errors of which he complains or he must demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack.

Id. at 493 (citing United States v. Frady, 456 U.S. 152, 167-68 (1982)). "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." Murray v. Carrier, 477 U.S. 478, 486 (1986).

The movant argues, in pertinent part, that the obstruction of justice enhancement was incorrectly applied because it was K.C. who lied while testifying, and not the movant. ECF No. 304 at 79-83. He alleges that Chief Judge Goodwin "openly admitted" that he did not consider all the evidence available to him in making the enhancement. Id. at 82. He argues that the § 4B1.5 enhancement was also incorrectly applied, because there is no evidence that he produced child pornography on more than one instance and because K.C. testified falsely. Id. at 84-95. The movant also argues that his sentence was unreasonable, as it failed to meet the sentencing goals of 18 U.S.C. § 3553(a). Id. at 98-100.

In response to the movant's sentencing claims, the United

States responds that the Court should summarily reject these claims, inasmuch as they were not pursued on direct appeal and were therefore procedurally defaulted, with the movant unable to demonstrate cause and actual prejudice for the default. ECF No. 332 at 34-36.

The movant admits to the procedural default, but claims that he can demonstrate cause and prejudice. ECF No. 346 at 66-70. According to the movant, the cause for his default was ineffective assistance of counsel by his appellate counsel, Mr. Schles, who allegedly ignored his entreaties to address these issues. Id. at 67. The movant claims that he was prejudiced by his sentence. Id.

The movant is not entitled to relief on his sentencing claims. He cannot show cause for a procedural default, as he does not state a sufficient claim of ineffective assistance of counsel. The movant also cannot show that the sentencing errors that he alleges amount to a miscarriage of justice. Moreover, the claims themselves are without merit.

The movant's sentencing hearings took place on three days over three months. ECF Nos. 248, 264, 268. The parties filed extensive sentencing memoranda with abundant discussion of applicable cases. ECF Nos. 231, 233, 240, 255, 260-63. Both enhancements (obstruction of justice based on Hicks's perjury at trial, and evidence of engaging in a pattern of sexual conduct) were correctly applied, and Chief Judge Goodwin gave a detailed and sufficient

75

explanation at the movant's sentencing as to why the movant's sentence satisfied the requirements of § 3553(a).

> I find that this sentence, while at the bottom end of the guideline range, reflects the nature and circumstances of the offense, the history and characteristics of the defendant, and the needs for deterrence.
> The deprivation of liberty is never a routine matter.
> So, I assure you, Mr. Giatras, I don't consider this or any case a routine case. And this has been a particularly difficult case, not only because of the nature of the offenses, but also because of the very substantial punishment that the Congress has provided for violation of those statutes.
> In deciding on the appropriate sentence, I've weighed all of the 3553(a) factors in addition to the guidelines. The Congress has decided, and I agree, child pornography is a very serious crime and should be punished seriously.
> A sentence of 30 years plus lifetime supervised release takes fully into account the nature and circumstances of the offense as I heard it, the history and characteristics of this defendant as I learned about them.
> It's a very long sentence. Mr. Hicks will be released from prison long after he's eligible for Social Security. Harsher sentences have been argued for, including life in prison. I believe life in prison is the harshest sentence that can be imposed in Federal Court upon someone, absent the murder cross-reference. And I believe that sentence should be reserved for those who viciously assault children in the production of pornographic images.
> Mr. Hicks did produce images of a young girl, and these images were from a child under his care. But this sentence of 30 years reflects the need to protect the public from further crimes of this defendant. It's my judgment it's sufficient to provide a deterrent effect, to reflect the nature of the offenses, and history and characteristics of the defendant.
> I note with considerable emphasis the blatant perjury of this defendant at the trial in this case and his continued denial of undeniable facts. This defendant had a stack of CDs found in his bedroom and they all contained child pornography, and he said he thought they

were Star Wars or Star Trek.  I can't remember which. He
also denied with all of the hard drives that were filled
with child pornography in his bedroom that he knew that
there was any child pornography on the computer.  This
from a man highly trained and knowledgeable of matters
concerning computer science.  To me these denials ring
hollow in light of the overwhelming evidence of the four
hard drives connected, or in the defendant's bedroom, the
28 CDs filled with child pornography that were found in
the defendant's home at the time the search was
conducted.
THE DEFENDANT: It was five, Your Honor.
THE COURT: A guideline sentence in this case adequately
reflects a sentence that is sufficient but it is not
greater than necessary to comply with the purposes of
3553(a).

ECF No. 287 at 20-22 (emphasis added).

The undersigned proposes that the presiding District Judge

**FIND** that the movant was not denied effective assistance of counsel

in any respect and that his attorneys performed well within the

range of reasonable professional assistance; thus the movant cannot

show "cause."

### Prosecutorial Misconduct

Claims of prosecutorial misconduct are properly raised on

direct appeal, not collateral attack.  Nonetheless, the undersigned

will address the movant's claims, which are listed at pages 48-49.

"[R]eversible prosecutorial misconduct generally has two

components: that (1) the prosecutor's remarks or conduct must in

fact have been improper, and (2) such remarks or conduct must have

prejudicially affected the defendant's substantial rights so as to

deprive the defendant of a fair trial." United States v. Chorman,

910 F.2d 102, 113 (4th Cir. 1990) (internal quotations omitted).

Several factors are relevant as to whether an improper argument satisfies the second prong of Chorman. United States v. Ollivierre, 378 F.3d 412, 421-22 (4th Cir. 2004) (quoting United States v. Mitchell, 1 F.3d 235, 241 (4th Cir. 1993)), rev'd on other grounds, 543 U.S. 1112 (2005). These factors include:

> (1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Id. (internal quotation marks and citation omitted). In determining whether a prosecutor's remarks were prejudicial, a court should also consider whether they were invited. United States v. Wilson, 135 F.3d 291, 299 (4th Cir. 1998) (citing United States v. Young, 470 U.S. 1, 12-13 (1985)).

While a prosecutor should refrain from stating his personal opinions about a defendant's credibility during argument, United States v. Young, 470 U.S. 1, 7 (1985), courts have held that use of "I think" is not impermissible if it clearly communicates only a comment on the evidence. United States v. Jaswal, 47 F.3d 539, 544 (2d Cir. 1995). See also Ollivierre, 378 F.3d at 423 (finding that, when the defendant claimed that the prosecutor improperly vouched for a witness, the prosecutor's preface of each the comments in question with "We submit to you," or "I submit to you," indicated that the comments were argument and not personal belief).

78

A prosecutor is also not allowed to express his personal belief that the defendant is guilty.  Id. at 418 (quoting United States v. Garza, 608 F.2d 659, 664 (5th Cir. 1979).

The United States makes two main arguments against the movant's prosecutorial misconduct allegations.  First, it argues that they should be categorically denied inasmuch as they have been procedurally defaulted by the movant, who failed to raise them on direct appeal.  ECF No. 332, at 36-37.  Additionally, it argues that the claims themselves are without merit.  Id. at 37-44.

The United States asserts that it did not withhold Brady materials, and has provided evidence that it was not delinquent in its discovery obligations.  Id. at 37; ECF No. 335-1, Ex. D; ECF No. 351, Ex. 1.  It also argues that the movant offers only vague and unfounded claims that it coached witnesses.  ECF No. 332 at 38.  The United States also contends that the movant's claims that it knowingly presented false testimony are without bases in law or fact.  Id. at 44.

The United States further objects to the movant's arguments that it made improper remarks in its opening statement and closing arguments.  It states that nowhere in its opening statement did it call the movant a "monster."  Id. at 40.  It also argues that its description of the movant as a "dedicated collector of child pornography" constituted a "fair, measured and accurate factual description of the evidence" in the movant's case.  Id.  The

government disputes the movant's allegation that it implored the jury "to do its job," stating that it never instructed the jury as such, and only permissibly told the jury to "convict [the movant]." Id. at 41-42.

The United States contends that the movant takes the "beast" remark out of context, as AUSA Forbes was referring to the nature of evidence in child pornography cases, and not the movant.  Id. at 41.  The pertinent portion of AUSA Forbes' opening statement to the jury on this matter was:

> In closing, ladies and gentlemen, and I apologize for this, you are going to see images, images of children, things that you've never seen, that are going to be very disturbing to you, and I apologize for that. But that's the nature of this beast. It's child pornography.  Child pornography is the sexual exploitation of children, and it's what we have to prove here today. I apologize for that. . . .

J.A. 103.  The United States also disputes the movant's claim that AUSA Forbes pointed her finger at him as she made the remark, stating that there is no support in the record for this assertion. ECF No. 332 at 41.

Moreover, the United States argues that its other statements at trial that have been challenged by the movant are not inappropriate:

> In closing argument the Assistant United States Attorney reviewed the forensic computer evidence in the case.  See Prosecution's Closing Argument, p. 13-14.  In so doing, the prosecutor briefly referenced the Defendant's testimony. He stated:
>
> > David Hicks's own testimony, aside from the

> bold lie about taking the picture of [C.A.],
> he did tell you that he's on the computer six
> to eight hours a day; that he is very familiar
> with computers. He's a self-proclaimed expert
> on computers. . . .

> Id. at 14.  Thereafter, the prosecutor left the topic of
> the Defendant's testimony and proceeded to argue the
> significance of the forensic computer evidence.  While
> the prosecutor did characterize the Defendant's disavowal
> of being responsible for the photo depicting the naked
> torso of C.A. as a "lie," the reference was brief and he
> did not call the Defendant "a liar."  See Trial Exhibit
> 32, Photo # 2530.  Moreover, the remark was not an
> expression of the prosecutor's personal opinion or
> suggestive that the prosecutor had some out-of-court
> basis for the statement.  Rather, the comment was fair
> and accurate and well-supported by the evidence.  Based
> on the testimony of C.A. and Kr.H.'s testimony, taken
> together, proved the falsity of the Defendant's testimony
> on the point.  C.A. testified that either the Defendant
> or his younger daughter, Kr.H., took the photo of C.A.
> J.A. 720.  (While C.A. could not be certain whether the
> Defendant took the photo, the fact that the child
> identified the Defendant as the sole alternative
> possibility was highly damaging evidence).  And when the
> Defendant's younger daughter – his own witness – was
> shown the photo of C.A., she testified that she did not
> know who the subject of the photo was (C.A.'s face was
> not fully visible) and that she did not know who took the
> photo.  J.A. 789.  Based on this testimony, the Defendant
> was only person left standing in the jury's eyes as the
> person who took the obscene photo of C.A.

ECF No. 332 at 42-43.

With regards to its assertion at trial that the movant was

"guilty," the United States explains that

> In rebuttal argument, the Assistant United States
> Attorney stated that the Defendant was "guilty" of each
> of the counts charged.  The prosecutor's argument that
> the Defendant was guilty was directly tied to the
> evidence in the case.  Notably, the prosecutor did not
> state her personal opinion of the Defendant's guilt (e.g.
> "I think" or "I believe" the Defendant is guilty).
> Rather the reference was tied directly to a recitation of

the evidence in the case.  The argument was also a direct
counter to the last part of the defense closing argument.
Just before sitting down, defense counsel argued that the
prosecution had failed to carry their proof ("they don't
have it") and admonished the jury to "put 'not guilty' on
those charges."   See Defendant's closing argument, p.
32-33. The prosecution's argument that the evidence in
fact showed that the Defendant was "guilty" was a fair,
appropriate,   and   common   rebuttal   to   this   defense
argument.

Id. at 43-44.

The movant shrugs off these arguments in his reply.  He states

that ineffective assistance of counsel was the reason that these

claims were procedurally defaulted.  ECF No. 346 at 73.  He makes

other assorted musings, many of which are reiterations of his

earlier assertions.

The United States conveniently fails to mention and
explain the indisputable fact that the 1) prosecution did
not provide defense counsel with statements made to
government officials; 2) statements made by various
witnesses not associated with the prosecution that
contradicted their earlier claims and; 3) relevant
records concerning the prior history of government
witnesses that had previously made false accusations in
past criminal prosecutions.  Specifically, the written
notes of interviews conducted with child witnesses A K,
K C, C A, S P and April Ellison, as well as several
teachers and counselors that were interviewed at Point
Harmony Elementary School.   What happened to those
documents?

Id. at 73.

* * *

Contrary to the United States' denials, there is nothing
"vague" as the United States constantly alludes to about
the prosecution's intentional failure to disclose and
release evidence of recanted, untruthful and misleading
statements and testimony of A K, K C and S P which
undoubtedly was both favorable and material to the

82

defense which violated Movant's due process rights guaranteed by the Fifth Amendment.

Id. at 74.

* * *

The United States in its response brief mendaciously contends that the Defendant offers nothing other than a vague, unfounded assertion that the prosecution "coached" its witnesses.  A perfunctory perusal of the trial transcripts in which child witnesses K C, K T, S P, A K and C A testified for the government, will unequivocally disclose and corroborate the fact said witness testimony was robotic, indistinguishable and contrary to the denials of AUSA Forbes, improperly "coached" by the prosecution.  Quite frankly, the record speaks for itself and so does the testimony.  Same questions asked of the child witnesses by the prosecution, with all witnesses responding in the same identical manner as the previous witness.  This is also corroborated by AUSA Forbes' own admissions in pre-trial hearings where she attempted to explain away the fact that they had dozens of visits with each witness, devoid of any documentation that would reflect the exact contents of their meetings, by stating that they were all visits of "trial preparation," where they instructed the witnesses what to say and how to say it.  Simply put, the "coaching" of these witnesses has been cleverly disguised as trial preparation.  No further evidence is necessary than the trial transcripts themselves, where AUSA Forbes asked each witness, leading them in the same manner, with the predetermined prompt: "How did that make you feel?" to which each responded, rather mechanically, "uncomfortable." None of these children had ever used that word to describe the feelings they had while at Movant's house.  The pattern of the questions and the answers provided by the child witnesses is actually quite obvious, they were improperly coached by the prosecution.

Id. at 74-75.

* * *

Unrealistically, the United States attempts to justify these prejudicial remarks by unbelievably suggesting the remark was not an expression of the prosecutor's own demented, personal opinion or suggestion

that the prosecutor had some out-of-court basis for the statement. AUSA Forbes continues her defense by stating, "Rather, the comment was fair and accurate and well supported by the evidence." Movant zealously rebuts and assails this explanation as the record will reflect there was no evidence to support such a preposterous claim. Where is this evidence?

Additionally, the United States misleadingly claims that the testimony of C A and Kr H taken together, proved the falsity of the Defendant's testimony on this point. Not true! Importantly, the United States asserts that C A falsely testified that either the Defendant or his younger daughter, Kr H, took the photograph of C A. If the investigators working for the U.S. Attorney's Office had properly done their job, they would have discovered A K took the photograph. Not Movant or his daughter. C A went on to testify that she could not remember Movant taking the photograph. That's because A K took it. This is further evidenced by the fact that the photograph clearly shows it was taken from C A's exact eye-level, by a child exactly C A's height.

Id. at 79.

*  *  *

The failure to investigate known inconsistencies in testimony and inability to do so later supports Movant's legitimate and viable claim that at least some of the witnesses testimony was false and the Government prosecutors, e.g. AUSA L. Anna Forbes and AUSA Stephen J. Grocki knew, or should have known, and inproperly [sic] presented it.

Id. at 80.

Additionally, the movant states that he is not taking AUSA Forbes' "beast" remark out of context, and he claims that she did indeed tell the jury to "do its job", citing to a portion of the rebuttal argument made by AUSA Forbes at ECF No. 246, ex. 1 at 65, lines 17-20.  ECF No. 346 at 78.

The undersigned does not need to undertake a procedural

default analysis as to the movant's prosecutorial misconduct claims, inasmuch as they ultimately ring false.

First, there is no evidence that the United States has withheld <u>Brady</u> materials. The movant's allegations of the existence of exculpatory material which was not disclosed to him and his counsel are unsupported by facts. The exhibit provided by the United States with its supplemental response to the movant's motion for discovery, ECF No. 351, Ex. 1, clearly demonstrates that the Government was meticulous in turning over pertinent materials to the movant and counsel. The movant specifically charges the United States with withholding child witness and school staff interview notes, but he has presented no evidence beyond his own word that such notes exist, or, if they do indeed exist, that they contain exculpatory material that the United States would be obligated to disclose.

The description at trial of the movant as a "dedicated collector of child pornography" was entirely appropriate, inasmuch as the remark was amply supported by evidence in the record. The movant's other assertions of prosecutorial misconduct are unfounded as well. Again and again, the movant inappropriately relies on self-serving allegations that are not supported by the record, if not directly contradicted by it.

AUSA Forbes did not tell the jury to "do its job." The movant's own citation to the record for this claim, ECF No. 246,

Ex. 1 at 65, lines 17-20, demonstrates his falsehood.  In reality, AUSA Forbes told the jury "[y]ou have the last word in this case, not me.  And that last word in this case should be 'guilty.'  It should be guilty on Count One, production; guilty on Count Two, production; guilty on Count Six, receipt; guilty on Count Seven, possession; and guilty on Count Eight, possession."  The movant is also incorrect that the United States inappropriately implied a personal belief that he was guilty.  First, requesting a guilty verdict is not the same as implying a personal belief of guilt.  Moreover, as the United States notes, its assertions in its rebuttal that the movant was guilty was in direct response to part of the movant's closing argument.  See Wilson, 135 F.3d at 299.

There is no evidence that the United States called the movant a "monster," and the movant steadfastly takes AUSA Forbes' "beast" remark out of context, while possessing no evidence that AUSA pointed her finger at him as she made that remark.

The one claim of alleged prosecutorial misconduct that merits comment is the "bold lie" remark made by AUSA Grocki.  However, upon further review, this remark did not constitute misconduct.  AUSA Grocki did not call the movant an actual liar, and his remark was supported by the testimony of witnesses.  Importantly, due to the overwhelming evidence presented against the movant, even if the "bold lie" remark was improper, it did not prejudicially affect the movant's substantial rights so as to deprive him of a fair trial.

86

The undersigned notes that Chief Judge Goodwin emphasized at sentencing that the movant perjured himself at trial.

The undersigned proposes that the presiding District Judge **FIND** that the movant defaulted his claims of prosecutorial misconduct, he has failed to show cause and actual prejudice excusing the default, and if considered, the claims have no merit.

<u>Recommendation</u>

For the foregoing reasons, it is respectfully **RECOMMENDED** that the presiding District Judge deny Defendant's § 2255 Motion and dismiss this matter.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rule 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2255 of Title 28, United States Code, and Rule 45(c) of the Federal Rules of Criminal Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good

cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to the movant, and to transmit it to counsel of record.


  January 12, 2012                    Mary E. Stanley
         Date                     Mary E. Stanley
                                  United States Magistrate Judge